UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JENNIFER VUONA, SARA HUNTER HUDSON, JULIA    ECF CASE
KUO, and CATHERINE WHARTON,

                  Plaintiffs,

- against -

MERRILL LYNCH & CO., INC., MERRILL
LYNCH, PIERCE, FENNER & SMITH,
INCORPORATED, and BANK OF AMERICA
CORPORATION,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# 10 CIV 6529

COMPLAINT

JURY TRIAL DEMANDED



Plaintiffs Jennifer Vuona ("Vuona"), Sara Hunter Hudson ("Hudson"), Julia Kuo ("Kuo"), and Catherine Wharton ("Wharton") (collectively "plaintiffs"), through their attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complain of defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, and Bank of America Corporation (collectively "defendants") as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action to remedy discrimination on the basis of sex in the terms and conditions of employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Executive Law § 290 et seq. ("Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Law"). Plaintiff Vuona further brings this action to remedy retaliation in violation of Title VII; the Executive Law; and the City Law.

2010 SEP -2 A II: 35

GENERAL COUNSEL
ON HUMAN RIGHTS
NYC COMMISSION

267664 v1

2.      Plaintiffs seek injunctive and declaratory relief, compensatory and punitive damages, liquidated damages, and other appropriate legal and equitable relief pursuant to Title VII, the Executive Law, and the City Law.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to § 706(f)(3) of Title VII, 42 U.S.C. § 2000e § 5(f)(3) and 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiffs' claims brought under the Executive Law, and the City Law.

4.      Plaintiffs filed charges with the United States Equal Employment Opportunity Commission (the "EEOC") on or about July 2, 2009, complaining of the unlawful acts alleged herein.  Following plaintiffs' requests, the EEOC issued plaintiff Wharton a notice informing her of her right to sue, received on or about June 14, 2010, and issued plaintiffs Vuona, Hudson and Kuo notices informing them of their right to sue, received on or about June 28, 2010.  Plaintiffs have thus complied fully with all prerequisites required by Title VII.

5.      Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiffs served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

6.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York and defendants regularly conduct business within the Southern District of New York.

## PARTIES

7.      Defendant Merrill Lynch & Co., Inc. is a financial services holding company, incorporated in Delaware and headquartered in New York.  Merrill Lynch & Co., Inc. and its subsidiaries provide financial and investment services, including financial advisement.

Merrill Lynch & Co., Inc. is an employer within the meaning of Title VII, the Executive Law, and the City Law.

8.      Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("MLPF&S) is a Delaware corporation headquartered in New York.  MLPF&S is a full service securities firm engaged in the retail and institutional sale of securities, options contracts and various other financial products.  MLPF&S is a wholly-owned subsidiary of Bank of America; prior to January 1, 2009, MLPF&S was a wholly-owned subsidiary of Merrill Lynch & Co., Inc. MLPF&S is an employer within the meaning of Title VII, the Executive Law, and the City Law.

9.      Defendants Merrill Lynch & Co., Inc. and MLPF&S are referred collectively herein as "Merrill Lynch."  Merrill Lynch employs nearly 17,000 persons nationwide as Financial Advisors ("FAs") who sell its products and services at its branch offices located throughout the country, including New York City.  Merrill Lynch's New York "flagship" branch, where plaintiffs worked, is located at 717 Fifth Avenue, New York, New York, 10022.

10.     Defendant Bank of America is a financial services company incorporated in Delaware and headquartered in North Carolina that regularly conducts business in New York City.  On September 15, 2008, Bank of America and Merrill Lynch announced that Bank of America would acquire Merrill Lynch for approximately $50 billion in an all-stock transaction. The acquisition closed on January 1, 2009.  Bank of America is an employer within the meaning of Title VII, the Executive Law, and the City Law.

11.     Plaintiff Vuona worked for Merrill Lynch in Manhattan from April 2008 until the involuntary termination of her employment on January 26, 2009.  Beginning January 1, 2009, after Bank of America acquired Merrill Lynch, Bank of America, jointly with Merrill Lynch, employed Vuona.  Vuona is a citizen of New York.

12.     Plaintiff Hudson worked for Merrill Lynch in Manhattan from July 2008 until the involuntary termination of her employment on January 26, 2009. Beginning January 1, 2009, after Bank of America acquired Merrill Lynch, Bank of America, jointly with Merrill Lynch, employed Hudson. Hudson is a citizen of New York.

13.     Plaintiff Kuo worked for Merrill Lynch in Manhattan from March 2008 until the involuntary termination of her employment on January 26, 2009. Beginning January 1, 2009, after Bank of America acquired Merrill Lynch, Bank of America, jointly with Merrill Lynch, employed Kuo. Kuo is a citizen of New York.

14.     Plaintiff Wharton worked for Merrill Lynch in Manhattan from October 2006 until the involuntary termination of her employment on January 26, 2009. Beginning January 1, 2009, after Bank of America acquired Merrill Lynch, Bank of America, jointly with Merrill Lynch, employed Wharton. Wharton is a citizen of California.

### FACTUAL ALLEGATIONS

Factual Allegations Common to All Plaintiffs

15.     Merrill Lynch has retail branches throughout the country. The "flagship" branch is the branch on Fifth Avenue in Manhattan. The Fifth Avenue branch had about 200 FAs. Historically, the Fifth Avenue branch has had very few female FAs. Upon information and belief, at the time plaintiffs were hired, the Branch Managers were paid bonuses for hiring women and minority FAs.

16.     Merrill Lynch had a training program for FAs. Under the program, Merrill Lynch hired trainees from other brokerage firms who were already licensed, as well as unlicensed trainees. The program lasted up to three years from the time the trainee was hired. The trainee was paid a salary and was credited with assets brought in and fees generated. Once a

trainee FA's production reached a certain level, she was removed from salary and, as a regular FA, was paid on a commission-only basis. The production of FA trainees was monitored regularly. FA trainees who were not on track with their production were placed on 90-day warnings and, if production did not improve, were fired.

17.    Merrill Lynch trainee FAs Vuona, Hudson and Kuo all participated in the Practice Management Development program. Wharton participated in the Paths of Achievement program, the predecessor to the Practice Management Development program. The performance requirements for both training programs were similar.

18.    The Practice Management Development program was broken down into three phases: an initial phase of about four months, during which trainees obtained licensing, received training and passed initial developmental assessments; Stage I, of approximately three months, where trainees passed a second developmental assessment, were assigned target production numbers, and obtained minimal performance requirements; and Stage II, a 36-month production phase with specific performance goals determined by salary and length of service.

19.    The Paths of Achievement program consisted of two phases. The first phase lasted four or more months, during which trainees obtained licensing, received classroom training and passed two internal development assessments. Trainees then entered the production phase for up to 24 months, until management determined that the trainee FA had reached a sufficient level of production to operate on a commission-only basis.

20.    At the time of plaintiffs' hire, there were about forty FA trainees. Over time, some FAs left and some were fired for performance issues.

21.     In or about July 2008, the person who directly supervised the FA trainees left and was not replaced. Thereafter, FA trainees were supervised by the Managing Director/Branch Manager.

22.     When plaintiffs were hired, the Managing Director/Branch Manager was Joe Mattia ("Mattia").

23.     In 2008, Mattia gave each female FA and FA trainee a copy of a book titled Seducing the Boys Club.  He requested that all female FAs read the book and attend a talk with the author he hosted one evening at the office, which plaintiffs understood they were required to attend.   The author encouraged women to stroke men's egos with flattery and manipulation in order to succeed in a male-dominated environment such as Merrill Lynch. Plaintiffs Vuona, Kuo and Wharton each considered the message of the book to be highly offensive.

24.     In the fall of 2008, due to the economic downturn, it became difficult for FAs to meet their goals.  Clients were reluctant to invest, particularly in the types of products that generated fees.  The non-fee-generating products, such as cash and cash equivalents, were generally more conservative investments.  Due to the market volatility it was best for clients to be in such conservative investments, but they did not count toward training program goals.  In addition, because of Bank of America's acquisition of Merrill Lynch, many potential and existing clients decided to wait until the merger was complete before moving money to Merrill Lynch. Merrill Lynch did not adjust performance goals for trainees and continued to push FAs to invest new assets into riskier fee-generating products.

25.     After it was announced that Bank of America was acquiring Merrill Lynch, management repeatedly assured all FAs, including plaintiffs, that their employment would not be affected by the merger.

26.     In December 2008 Mattia was fired.  In late January 2009, Linda Houston ("Houston") was appointed as the new Managing Director/Branch Manager for the Fifth Avenue branch.

27.     By late January 2009, fewer than thirty FA trainees remained, of which only seven were women.  Upon information and belief, some males who had failed the program had been reassigned or rehired as client associates on FA teams.

28.     On January 26, 2009, approximately thirteen FA trainees were laid off from the Fifth Avenue branch.  All of the female FA trainees were fired, including plaintiffs. About fourteen male FA trainees were retained, including men who were not meeting their performance goals.

29.     With the exception of Wharton, who received a warning in the fall of 2007 for failing to meet a revenue goal, plaintiffs did not receive warnings of any kind from either the Branch Manager or their program coaches.

30.     Some FA trainees formed a "team" with an established FA.  Under the team system, senior FAs would mentor the trainee and share some of their business, and the team would split the credit (not necessarily equally) for production.  Several men having difficulties meeting their goals or with little business of their own were placed on teams just prior to the January layoffs.  In contrast, several women, including Vuona, asked as early as April 2008 to be placed on teams but were not.

31.    On information and belief, Merrill Lynch did not fire two males, one hired in November 2008 who had zero clients and another male hired in December 2008 with only one or two.  In contrast, Merrill Lynch fired a similar newly-hired woman, recently recruited from UBS, shortly after she received her broker number.

Factual Allegations Relevant to Plaintiff Jennifer Vuona

32.    Vuona received a BA from Smith College in 2002.  After college, she worked as a Research Associate for a consulting firm.  She then worked for two years as a Fraud Analyst for the United States Attorneys' Offices in the Southern and Eastern Districts of New York.  At the time Merrill Lynch recruited Vuona to join Merrill Lynch in November 2007, Vuona had been a Financial Advisor ("FA") for Citi Smith Barney for a year and a half.

33.    Vuona worked for Merrill Lynch as an FA from April 2008 until she was fired on January 26, 2009.  Vuona was hired as an FA recruit into the Practice Management Development program.

34.    Vuona had her licenses prior to joining Merrill Lynch.  During her first several months at Merrill Lynch, she completed all of the required assignments, including worksheets, online tutorials, internal exams and Stage I of the Certified Financial Planner examination process.  She passed her first review and was given high marks by the program coordinators.  One coordinator called Vuona to personally congratulate her on how well she had done.  Vuona began her first month of production in August 2008.

35.    During Vuona's second week at Merrill Lynch, Mattia, through his assistant Alana Ditarano ("Ditarano"), assigned Vuona to answer his telephone while Ditarano was on vacation.  Because Vuona did not think this was an appropriate assignment for an FA, Vuona asked Ditarano if any of the male FAs were ever directed to answer the telephones.

Ditarano responded, "No, Joe feels more comfortable with girls answering the phone. You understand, right?" While answering the phones, Vuona did not have the same ability as her male colleagues to build her lead lists or reach out to prospective clients. Many senior FAs in the office asked Vuona if she was hired as a secretary or an FA. Vuona's credibility as a professional in the office was compromised immediately.

36.     After Vuona began to answer Mattia's telephone, Anna Roccanova ("Roccanova"), Administrative Manager, whom Vuona had never met, called her into her office. Roccanova screamed at Vuona because she did not believe she was "perky enough" when she answered Mattia's telephone. Roccanova told Vuona that she would "not last long" if she continued to have what Roccanova termed an "uncooperative attitude" about answering the telephone. Vuona told Roccanova that her performance was to be judged on her ability to bring business to the firm, and that she could not accomplish that while performing another job function. Vuona also told Roccanova that her yelling was inappropriate, degrading and frightening. The next morning, Vuona told Mattia about Roccanova's abusive conduct and asked him about the telephone-answering assignment. Mattia explained that Roccanova was difficult, especially on women, and was at the branch before there were any female FAs. Vuona told Mattia she would be glad to answer his telephones if male FAs were also asked to do so. After that, a female intern was assigned to answer Mattia's telephone.

37.     One of Vuona's goals for Stage II was to bring in two households with over $250,000 in assets; she surpassed that goal, securing two households with over $300,000 in assets. Given the market conditions at the time, Vuona created both short-term and long-term investment models for these clients, with the long-term model designed to transfer their assets to

fee-generating investments once the market stabilized.  Vuona was fired before those assets could generate revenue.

38.     In or about November 2008, Vuona developed an opportunity to bring in money from a non-profit organization.  In order to do so, she needed the assistance of certain bankers, who were men.  Vuona repeatedly asked the bankers for assistance to bring in this new business; they ignored her requests and told her to do the initial meetings by herself.  In or about January 2009, one of the bankers saw the representative from the non-profit on a news program and told Vuona that he now realized the significance of the opportunity with the non-profit.  Before she could follow through with the banker and the non-profit, Vuona was fired.

39.     As early as April 2008 Vuona asked to be placed on a team but was never placed on one.

40.     Due to FA departures, Vuona was given 25 new clients, many within weeks of her firing.  Vuona had a fiduciary responsibility to go through each account and each position, meet with the clients, and make recommendations.  This was a time-intensive process but legally necessary.  Although Vuona had a fiduciary obligation to spend considerable time with these clients, Merrill Lynch told her that it was not giving her credit for any of these clients' assets.  The combined assets were several million dollars.

41.     On January 26, 2009, Vuona was called to a meeting with Roccanova and Ken McCracken ("McCracken"), a manager in client services/operations.  They told Vuona that she was being laid off.  They stated that her termination was not related to her performance, but was due to the economy.  Roccanova told Vuona that she should not try to become an FA at another firm because it was not a good time.  Roccanova handed Vuona a tissue and said that, "as a female, [she] wouldn't want [Vuona's] mascara to run."  Vuona was not given any

documentation about the termination or any benefits information, nor was she offered any severance. Roccanova told Vuona that she was not entitled to any paperwork or any severance.

42. On January 27, 2009, Vuona called Merrill Lynch's Human Resources ("HR") hotline. She asked if she would be receiving any paperwork or notice about the termination of her employment. Vuona also asked why she was not receiving severance. The representative with whom she spoke said he would escalate her concerns to the Employee Relations ("ER")/HR Vice President responsible for her branch.

43. On February 2, 2009, Vuona spoke with Angela Hilas ("Hilas") from ER by telephone. Vuona told Hilas that she was uncomfortable with several aspects of her firing. Vuona also told Hilas that she had spoken to several other women who shared her concerns. Vuona asked Hilas a number of questions, including who had made the decision and what criteria was used to determine who was dismissed and who remained employed. Hilas could not answer any of Vuona's questions and maintained that her firing was due to the economy. Vuona told her that all of the female FA trainees in the branch, the "flagship branch," had been fired but that several men remained, including men not meeting their goals. Vuona said that the decisions seemed to have been very subjective. Hilas told Vuona that she would get back to her by February 4, 2009, with answers to the questions Vuona had raised.

44. On February 4, 2009, Vuona called Hilas, who told her that she did not have answers and would call her by February 6, 2009. During this call, Hilas was hostile and was dismissive of Vuona's concerns.

45. On February 6, 2009, because Vuona had not heard from Hilas, Vuona called Hilas several times over a five hour period and left her several voicemail messages. Vuona then called the main HR number and asked to be connected to Hilas' supervisor, who

tracked down Hilas. Hilas was annoyed that Vuona had found her and told her that she did not have answers to any of her questions but that she would speak with Roccanova and call her back before the end of the day. Vuona asked Hilas why she would be speaking with Roccanova rather than someone more senior in management. Hilas refused to speak to senior management and said that Roccanova was the only person with whom she would speak. Vuona told Hilas about Roccanova's past conduct toward her and other women.

46.     At about five o'clock on February 6, 2009, Hilas called Vuona. Hilas informed Vuona that her request for either severance or documentation concerning her firing was denied. Hilas stated that Vuona's questions about the subjective nature of the decision to fire her did not merit further investigation, and that she was "closing this matter." Hilas said that Merrill Lynch had no obligation to tell Vuona who made the decision to fire her, or why. During this call Hilas was again very hostile and was dismissive of Vuona's concerns.

47.     On February 10, 2009, Hilas called Vuona again after speaking with Hudson, one of the other FA trainees fired with Vuona. Hilas reiterated to Vuona that Merrill Lynch was under no obligation to explain to Vuona why she lost her job while others in the same role remain employed. Hilas again stated that she was closing Vuona's inquiry and that Vuona would receive nothing in writing from Merrill Lynch.

Factual Allegations Relevant to Plaintiff Sara Hunter Hudson

48.     Hudson received a BA from Sarah Lawrence College in 1962. After college, she spent approximately eleven years working for a variety of non-profit and publishing companies, including the Metropolitan Museum of Art, CBS News and American Heritage Publishing Company. In 1980, Hudson made a career change to finance. She worked in various Private Banking positions in the 1980s for Chemical Bank, Irving Trust Co., and Manufacturers

Hanover Trust.  For five years Hudson was Vice President and Director of Marketing for an investment management firm.  After that, for nine years she was a Vice President and a Senior Business Development Officer for Bank of New York.  During the year prior to joining Merrill Lynch, Hudson was an FA at Morgan Stanley.

49.     Mattia recruited Hudson from Morgan Stanley in July 2008.

50.     Hudson obtained her licenses, except those relating to insurance, prior to joining Merrill Lynch.  She began production in September 2008, the same month that Bank of America announced it would take over Merrill Lynch at the end of the year.

51.     In her first three months of production, Hudson secured approximately $340,000 in business.  One of the accounts she brought over from Morgan Stanley consisted of $250,000 in bonds.  The top fixed income specialist at her Merrill Lynch branch advised Hudson not to sell the bonds because there was nothing of the same caliber available in the market at that time.  Those assets were therefore not fee-generating.  The other account she brought over from Morgan Stanley was a $90,000 IRA rollover which was entirely in Bank of New York Stock.  It would have been damaging to the portfolio to try to sell the stock in a depressed market.

52.     In late December 2008, Hudson began the process of forming a team with a more senior FA, who was a woman.  The two began the paperwork but, due to various holidays and vacations, had not completed the paperwork by the time Hudson's employment was terminated.

53.     In late December 2008/early January 2009, Hudson had five or six clients ready to bring their assets to Merrill Lynch, including clients with $4 million, $10 million and $75 million in assets, the latter of which was based on a pre-existing relationship Hudson had

brought to the Bank of New York. These clients wanted to wait for the merger to be completed before moving any assets to Merrill Lynch.

54.     During that same period, Hudson also had an extraordinary opportunity. Through her contacts, Hudson had interested a U.S. holding company that represented a foreign country and its most prominent family to do business with Merrill Lynch. The business potentially would have been worth about one billion dollars at that time. Hudson set up a meeting with the representative for the foreign government and the family, and invited Joel Meshel ("Meshel"), Vice President and Regional Sales Manager, and two bankers, both of whom were men, to attend. Meshel asked, in a belittling tone, why the government and family would bring Hudson this business. Hudson gave Meshel a copy of her resume. In the same tone, Meshel said it would be very good for Hudson if she brought in this business. Hudson pointed out that it would be good for Merrill Lynch if she brought in this business.

55.     At the time of the scheduled meeting with the representative of the foreign government and family, Meshel said he could not attend because "something came up." The bankers also cancelled because they said they had "calls to make." Hudson insisted that Meshel and the bankers meet with the representative, who had arrived and was waiting. Although the bankers stayed for the meeting, Meshel left after about ten minutes to take an internal call. The bankers later told Hudson that the business seemed valid, but that they could not follow through with their research until they received word from Meshel to do so.

56.     Hudson tried to set up a follow-up meeting with Meshel, but he refused to meet.

57.     As a result, Merrill Lynch did not acquire the business. Upon information and belief, the foreign government and family brought their business to a financial services firm other than Merrill Lynch.

58.     On January 26, 2009, Hudson, like Vuona, was called to a meeting with Roccanova and McCracken where she was told she was being laid off. Roccanova said that Bank of America had directed Merrill Lynch to dismiss everyone they hired in the last year and that Bank of America no longer wanted to pay the salaries of new recruits or trainees. They said it had nothing to do with Hudson's performance, but was due to the economy. Hudson asked Roccanova if Bank of America knew that she had 25 years of experience in the financial world. Roccanova responded that Hudson could approach both Bank of America and Merrill Lynch's Human Resources departments after February 6, 2009, her last paid day. Hudson was not given any documentation about the termination or any benefits information.

59.     Between January 26 and February 10, 2009, Hudson attempted to call Roccanova for more information. Hudson was not able to reach Roccanova and her calls were not returned.

60.     Vuona gave Hudson the telephone number for Hilas from ER.

61.     On February 10, 2009, Hudson called Hilas and told her that she had some questions and concerns about her dismissal. Hudson told Hilas that she was dismayed that she had been dismissed without any warning and that no severance was being offered. Hilas became irate and defensive. She demanded to know who had given Hudson her number. When she would not tell her, Hilas said that she knew Hudson had obtained her number from another woman from her branch and that they were "wasting [their] time."

Factual Allegations Relevant to Plaintiff Julia Kuo

62.     Kuo graduated with honors from Carnegie Mellon University in 1995, and received a B.S. in Industrial Engineering with a minor in Japanese.  After college, she worked as an analyst for two financial firms.  She then became a desktop developer for UBS.  Kuo worked at Merrill Lynch as a Business Analyst and Assistant Vice President in Global Emerging Markets for three years.  After that, Kuo worked for Credit Suisse, first as a Business Analyst/Assistant Vice President in Global Emerging Markets and then in Product Control.  Kuo then spent one and a half years as an FA for UBS Financial Services.

63.     Kuo was recruited to Merrill Lynch and began working in March 2008.

64.     Kuo had her licenses prior to being hired by Merrill Lynch, and began production in July 2008.

65.     Kuo hosted events and seminars to try to obtain new clients, and was active in several business networking groups.  Kuo worked with a summer intern to generate leads from the public business library database.  Kuo also set up a split pool with FA's for potential clients, which could be expected to generate considerable production revenue.

66.     Kuo met all of her Stage I goals.  In Stage II her goals were $10,000 production and $350,000 in net new assets.  At the time her employment was terminated, she had over $9,000 in production credits and $2 million in net new assets, the latter well in excess of her goal.

67.     In addition, Kuo had brought in substantial business for which she did not receive full credit.  For example, as a trainee, Kuo could not be an international advisor.  This required her to split credit, including for two clients worth $350,000 and $400,000, with FAs who had little involvement in the transactions.  In October 2008, she brought in a 401(k) profit

sharing plan for a physical therapy clinic that, due to a rule change in the summer of 2008, did not count toward annualized assets. She also brought in another 401(k) profit sharing plan, valued at $500,000, that also was not counted. Announcement of rule changes often came after the change took effect, undermining business strategies Kuo and others had put in place to meet their goals.

68.     On January 26, 2009, Kuo was called to a meeting with the new Managing Director/Branch Manager, Houston, and a person from Compliance who did not work in the Fifth Avenue Branch. They told Kuo she being laid off because of the economy. Kuo was not given any documentation about the termination or any benefits information, nor was she offered any severance. They told her to leave the office as soon as possible.

69.     Kuo later returned to Houston's office. Kuo told her that she had a half million dollars in assets coming in and was meeting her goals. Houston said that she was sorry, but that she was not going to reverse her decision, which was final. Houston told Kuo to hand in her ID, call Human Resources, and cancel all of her appointments.

70.     Kuo tried to obtain more information about her dismissal. The Fifth Avenue branch assistant to Houston, Annette Kennedy, directed Kuo to call the 800 number for HR. When Kuo called the 800 number she was told she was part of a nationwide lay-off and that any other questions should be directed to her local branch. After about three or so calls to HR, Kuo was told that Merrill Lynch did not have to provide her with any documentation about the termination of her employment.

Factual Allegations Relevant to Plaintiff Catherine Wharton

71.     Wharton received a BA from the University of California, Berkeley, in 2000.  After college, she was a business analyst for Deloitte Consulting and then Associate Manager in the Corporate Communications department of a brand strategy consulting firm.

72.     Wharton was hired by Merrill Lynch as an FA trainee in October 2006.

73.     Wharton acquired her licenses and began production in May 2007.

74.     Throughout her time in the program, Wharton was held out by management as an example of a successful trainee and labeled by one program coach as a "winner."

75.     Despite the difficulties in the market, at the time Wharton was fired in January she had achieved  $13 million in assets out of the $15 million total she would need to graduate from the program.  Wharton was scheduled to complete the program on May 31, 2009, and was considered by management to be on-target for meeting her overall asset goals, even though, because of market conditions, her fee-generating assets were below goal.  Completion of the program would have taken Wharton off salary and placed her compensation on a commission-only basis.

76.     Prior to her dismissal, Wharton had a list of 125 senior financial professionals who had expressed an interest in meeting with her in the next one to six months, including an executive of a venture capital firm that could have invested up to $20 million.  In August/September 2008, just prior to Merrill Lynch's near collapse, Wharton had brought in six financial professionals as new clients.  Wharton also had other prospects who had met with her and were considering transferring assets to Merrill Lynch.  In addition, she had existing clients who were exploring transferring additional assets or refinancing their mortgages, including a

new client who was interested in transferring up to a million dollars from an account held at another firm.

77.    On January 26, 2009, Wharton, like Vuona and Hudson, was called to a meeting with Roccanova and McCracken where she was told she was being laid off.  They told Wharton it had nothing to do with her performance, but was due to the economy.  Roccanova told Wharton that she should not try to become an FA at another firm because it was not a good time.   Wharton was not given any documentation concerning her firing or any benefits information, nor was she offered any severance.

## FIRST CAUSE OF ACTION

### Gender Discrimination in Violation of Title VII
(All Plaintiffs)

78.    Plaintiffs repeat and reallege paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.    By the acts and practices described above, defendants discriminated against plaintiffs on the basis of their sex.

80.    As a result of defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

81.    Defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiffs' rights protected under federal law.

## SECOND CAUSE OF ACTION

Retaliation in Violation of Title VII
(Plaintiff Vuona)

82.    Vuona repeats and realleges paragraphs 1-81 of this Complaint as if fully set forth herein.

83.    By the acts and practices described above, defendants retaliated against Vuona in the terms and conditions of her employment for opposing unlawful employment practices, in violation of Title VII.

84.    As a result of defendants' retaliatory acts, Vuona has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

85.    Defendants acted with malice and/or reckless indifference to Vuona's federally protected rights.

## THIRD CAUSE OF ACTION

Gender Discrimination in Violation of the Executive Law
(All Plaintiffs)

86.    Plaintiffs repeat and reallege paragraphs 1 to 85 of this Complaint as if fully set forth herein.

87.    By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, in violation of the Executive Law.

88.    As a result of defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

<u>Retaliation in Violation of the Executive Law</u>
(Plaintiff Vuona)

89.    Vuona repeats and realleges paragraphs 1-88 of this Complaint as if fully set forth herein.

90.    By the acts and practices described above, defendants retaliated against Vuona in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

91.    As a result of defendants' retaliatory acts, Vuona has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

<u>Gender Discrimination in Violation of the City Law</u>
(All Plaintiffs)

92.    Plaintiffs repeat and reallege paragraphs 1 to 91 of this Complaint as if fully set forth herein.

93.    By the acts and practices described above, defendants have discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, in violation of the City Law.

94.    As a result of defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION

### Retaliation in Violation of the City Law
(Plaintiff Vuona)

95.     Vuona repeats and realleges paragraphs 1 to 94 of this Complaint as if fully set forth herein.

96.     By the acts and practices described above, defendants retaliated against Vuona in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the City Law.

97.     As a result of defendants' retaliatory acts, Vuona has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress, and reputational injury unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an award:

(a)     declaring that the acts and practices complained of herein are in violation of Title VII, the Executive Law and the City Law;

(b)     enjoining and permanently restraining these violations of Title VII, the Executive Law and the City Law;

(c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiffs' employment opportunities;

(d)     directing defendants to reinstate plaintiffs to the positions they would have occupied but for defendants' unlawful conduct and making them whole for all earnings they would

267664 v1

have received but for defendants' unlawful conduct, including, but not limited to, wages, pension, 401(k) contributions, bonuses and other lost benefits;

(e)      directing defendants to pay plaintiffs punitive damages;

(f)      directing defendants to pay an additional amount to compensate plaintiffs for the emotional distress and reputational damage defendants' unlawful conduct has caused plaintiffs;

(g)      awarding plaintiffs such interest as is allowed by law;

(h)      awarding plaintiffs damages to compensate for any adverse tax consequences;

(i)      awarding plaintiffs their reasonable attorneys' fees and costs; and

(j)      granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
          September 2, 2010

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By:      _Anne Vladeck_

Anne C. Vladeck
Anne L. Clark
Gregory S. Chiarello
Attorneys for Plaintiffs
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

267664 v1                     23