UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                            :
JENNIFER VUONA, SARA HUNTER HUDSON, JULIA    :
KUO, and CATHERINE WHARTON,                              :
                                                            :              10 Civ. 6529 (PAE)
                                    Plaintiffs,             :
                                                            :              OPINION & ORDER
                    -v-                                      :
                                                            :
MERRILL LYNCH & CO., INC., MERRILL LYNCH,         :
PIERCE, FENNER & SMITH, INC., and BANK OF           :
AMERICA CORP.,                                          :
                                                            :
                                    Defendants.            :
                                                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

    Plaintiffs Jennifer Vuona, Sara Hudson, Julia Kuo, and Catherine Wharton (collectively,

"Plaintiffs") bring suit against defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce,

Fenner & Smith, Inc., and Bank of America Corporation (collectively, "ML"), alleging that their

employment was unlawfully terminated on the basis of gender, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the New York State Human

Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 *et seq.*; and the New York City Human Rights

Law ("NYCHRL"), N.Y. City Admin. Code §§ 8–101 *et seq.*  Vuona also claims that she was

unlawfully retaliated against for opposing discrimination proscribed by these laws.  ML moves

for summary judgment on all claims.  For the following reasons, ML's motion is granted as to

Plaintiffs' Title VII and NYSHRL claims, and the Court declines to exercise supplemental

jurisdiction as to Plaintiffs' NYCHRL claims.

## I.      Background and Undisputed Facts[1]

In late 2008 and early 2009, Plaintiffs were all enrolled in one of two Financial Advisor

("FA") trainee programs at ML's Fifth Avenue branch in Manhattan.  One program, the "Paths

of Achievement" ("POA") program, covered all FA trainees enrolled before February 1, 2008,

including Wharton.  Pl. 56.1 ¶¶ 323, 348; Def. 56.1 ¶¶ 16, 49.  The other, the "Practice

Management Development" ("PMD") Program, covered all FA trainees enrolled after February

1, 2008, including Vuona, Hudson, and Kuo.  Pl. 56.1 ¶¶ 324, 339.

### A.  The Training Programs

The PMD program was divided into three phases.  Def. 56.1 ¶ 18; Pl. 56.1 ¶ 327.  The

first was the Trainee phase, during which FA trainees underwent initial testing and received

relevant licenses if they did not already hold them.  Def. 56.1 ¶ 19; Pl. 56.1 ¶ 328.  At the end of

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion—specifically, Defendants' Local Rule 56.1 Statement of Material Facts ("Def. 56.1") (Dkt. 26); the Declaration of Joel Meshel in Support of Defendants' Motion for Summary Judgment ("Meshel Decl.") (Dkt. 35); the Declaration of Audrey Y. Dupont in Support of Defendants' Motion for Summary Judgment ("Dupont Decl.") (Dkt. 36); Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Pl. 56.1") (Dkt. 39); the Declaration of Anne L. Clark in Opposition to Defendants' Motion for Summary Judgment ("Clark Decl.") (Dkt. 40); the Declaration of Sara Hunter Hudson in Opposition to Defendants' Motion for Summary Judgment ("Hudson Decl.") (Dkt. 41); the Declaration of Julia Kuo in Opposition to Defendants' Motion for Summary Judgment ("Kuo Decl.") (Dkt. 42); the Declaration of Jennifer Vuona in Opposition to Defendants' Motion for Summary Judgment ("Vuona Decl.") (Dkt. 43); and the Declaration of Catherine Wharton in Opposition to Defendants' Motion for Summary Judgment ("Wharton Decl.") (Dkt. 44).  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

this phase, the FA trainees received a "production number" which permitted them to begin

bringing in business, triggering the start of Stage I of their program.  Def. 56.1 ¶ 20; Pl. 56.1

¶¶ 329, 331.  During Stage I, which lasted three months in the PMD program, the FA trainees

underwent further training programs while undertaking to find and serve wealth management

clients.  Def. 56.1 ¶¶ 21–22; Pl. 56.1 ¶ 331.  The time which trainees had spent in service to ML

was measured in "Length of Service" ("LOS") months; but during the three months of Stage I,

the trainees remained at all times in LOS month zero.  Pl. 56.1 ¶ 331.  At the end of Stage I, the

FA trainees entered Stage II, which lasted 36 months.  Def. 56.1 ¶ 22; Pl. 56.1 ¶ 332.

During Stages I and II, the FA trainees' performance was measured against performance

"hurdles" or "targets" which varied depending on the salary range assigned to the trainee when

he or she was hired.  Def. 56.1 ¶ 24; Pl. 56.1 ¶ 334.  The three primary hurdles were "production

credits" ("PCs"), defined as the revenue generated by the products clients purchased; "new

annuitized assets," defined as the sum of assets generating a recurring stream of revenue; and the

number of new client relationships formed with households having a net worth above $250,000.

Def. 56.1 ¶ 24; Pl. 56.1 ¶¶ 334–335.  The FA trainees were tracked monthly and reviewed on a

quarterly basis, with each trainee receiving a grade of "Met Requirements" or "Does Not Meet."

Def. 56.1 ¶ 26; Pl. 56.1 ¶ 337.  During Stage I and the first 12 months of Stage II of the PMD

program, the FA trainees were salaried; thereafter, they were transitioned to a reduced salary, but

were eligible for incentive compensation and performance-based bonuses.  Def. 56.1 ¶ 31; Pl.

56.1 ¶ 338.

The POA program, in which Wharton was enrolled, was broadly similar to the PMD

program, although the parties dispute the precise extent of the programs' similarity.  *Compare*

Def. 56.1 ¶ 16, *with* Pl. 56.1 ¶¶ 16, 341.  The POA program consisted of two phases, not three:

POA trainee, and then POA FA.  Pl. 56.1 ¶ 342.  The POA trainee stage was the equivalent of

the PMD trainee stage.  *Id.* at ¶ 343.  The POA FA stage lasted up to 24 months, rather than the

36 months in the PMD program; the POA FA stage ended, however, as soon as the trainee met

his or her performance requirements.  Def. 56.1 ¶ 22; Pl. 56.1 ¶ 344.  The POA trainees were

salaried until they graduated from the program, and then were compensated solely by

commission, rather than the mix of salary and incentive compensation given to PMD trainees

beginning in the 13th month of Stage II.  Pl. 56.1 ¶¶ 347, 338.  The performance of POA

trainees, like that of PMD trainees, was measured on a quarterly basis.  *Id.* at ¶ 345.  However,

POA trainees' performance was measured by (1) the better of cumulative production credits or

annuitized assets less liabilities; (2) total assets less liabilities; and (3) wealth management points

for completion of training courses and evaluations.  *Id.*

### B.   The Plaintiffs

The four Plaintiffs all had experience in business before joining ML's FA trainee

program.

Wharton, who joined the POA program in October 2006, had been, *inter alia*, a business

analyst at Deloitte Consulting before joining the FA trainee program.  Pl. 56.1 ¶ 419.  Wharton

received her production number in May 2007.  She had been scheduled to graduate from the

POA program in May 2009.  *Id.* at ¶ 421.

Kuo had spent more than a decade as a business analyst at financial firms including UBS

and Merrill Lynch.  *Id.* at ¶ 432.  In November 2006, Kuo joined a FA trainee program at UBS.

Def. 56.1 ¶ 111; Pl. 56.1 ¶ 433.  In March 2008, Kuo moved to ML's FA trainee program, Def.

56.1 ¶ 112; Pl. 56.1 ¶ 437; in July 2008, she entered Stage II of the PMD program.  Pl. 56.1 ¶

437.

Vuona had professional experience including as a fraud analyst for the United States Attorney's Office for the Southern District of New York.  Pl. 56.1 ¶ 448.  Before joining the PMD program at ML, Vuona had been enrolled in an analogous program at Citigroup Smith Barney for approximately one year.  Def. 56.1 ¶ 76; Pl. 56.1 ¶ 448.  In April 2008, Vuona joined the PMD program, Def. 56.1 ¶ 77; Pl. 56.1 ¶ 450; in August 2008, she entered Stage II of the program, Pl. 56.1 ¶ 450.

Hudson had worked in the financial services industry since the 1980s, holding positions at Chemical Bank and Manufacturers Hanover Trust.  Pl. 56.1 ¶ 455.  Between 1994 and 2003, Hudson was a vice president at Bank of New York, where her role included generating investment management business for the bank.  *Id.* at ¶ 456.  Hudson, like Vuona and Kuo, had been enrolled in the FA trainee program of another bank—Morgan Stanley—before choosing to enroll in the PMD program at ML.  Def. 56.1 ¶ 141; Pl. 56.1 ¶ 458.  In July 2008, Hudson joined the PMD program, Def. 56.1 ¶ 143; Pl. 56.1 ¶ 461; in November 2008, she entered Stage II of the program, Pl. 56.1 ¶ 461.

### C.  Perceived Incidents of Gender Bias During Plaintiffs' Employment at ML

Plaintiffs complain of a number of perceived incidents of gender bias during their tenure at ML.  These incidents, they contend, support the inference that their ultimate termination was motivated by unlawful discriminatory animus.

First, Vuona alleges that she was once required to answer the telephone for Joseph Mattia, the Fifth Avenue branch manager during a portion of her tenure.  Vuona Dep. 196, 207–10; Vuona Decl. ¶ 4.  According to Vuona, when she asked why she was singled out for this duty, she was told that Mattia preferred that "girls" answer his phone.  Vuona Dep. 203; *see* Roccanova Dep. 135.  While she was performing this task, Vuona alleges that another

5

supervisor, Anna Roccanova, told Vuona that she was not "perky" enough when answering Mattia's phone.  Vuona Dep. 211, 214–16.

Second, Hudson alleges that she approached another manager at the Fifth Avenue branch, Joel Meshel, seeking his assistance in following a potential lead on a substantial piece of business.  Hudson Dep. 260–61, 263, 267, 277.  Meshel did not assist Hudson's effort to land the client; during their discussion, Meshel allegedly suggested that Hudson "stick to her knitting." *Id.* at 266.

Third, all Plaintiffs except Hudson, who had not yet begun her tenure at ML, complain that they were invited by Mattia to a corporate event for female employees at which an author touted her book, entitled Seducing the Boys Club, which allegedly advocated that women in corporate environments use seduction to manipulate men in furtherance of their careers.  Vuona Dep. 174, 179, 191; Wharton Dep. 226–27, 235; Kuo Dep. 206; Mattia Dep. 135–136, 138; *see* Clark Decl. Ex. 42.

Finally, Plaintiffs allege that male employees at ML were assigned mentors more quickly than were female trainees, Pl. 56.1 ¶¶ 605–608; *see also* Kuo Dep. 146; Kuo Decl. ¶ 5; Hudson Dep. 153, and that ML promoted "teaming" relationships, in which FAs could pool, split, or share all or some portion of accounts acquired by one or both team members, for men but not for women.  Vuona Dep. 149; Kuo Dep. 234; Hudson Dep. 187–88, 190–92, 196.

### D.  ML's Reduction in Force

The third and fourth quarters of 2008 saw a severe economic downturn in the American economy generally, and in the financial sector in particular.  In September 2008, ML was acquired by Bank of America Corporation, although the transaction did not close until January 2009.  Def. 56.1 ¶ 182; Pl. 56.1 ¶ 316.  In mid-January 2009, ML's senior management notified

the branch offices, including the Fifth Avenue branch, that headcount needed to be reduced, and

that there would therefore be an imminent reduction in force ("RIF") in the FA trainee program.

Roccanova Dep. 153–54; Meshel Dep. 148–49; Houston Dep. 118–19.  That layoff would result

in the termination of 14 FA trainees.  Def. 56.1 ¶ 188; Pl. 56.1 ¶ 610.

As part of the RIF process, ML management provided the Fifth Avenue branch with two

lists.  Meshel Dep. 153–54; Roccanova Dep. 154, 156; Houston Dep. 179; Clark Decl. Ex. 8;

Meshel Decl. ¶¶ 13–14, Ex. A.  Those lists, and the branch management's interactions with

them, are critical to the resolution of this motion.

### 1.  The "Presumptive" Layoff List

The first list was made up of FA trainees who had failed to meet certain benchmarks; this

was supposed to be a "mandatory" or "presumptive" layoff list.[2]  Meshel Dep. 153–54, 156;

Meshel Decl. ¶ 13, Ex. A; Kamil Dep. 103; Houston Dep. 179; Roccanova Dep. 153–54; *see*

Clark Decl. Ex. 8.  The list was generated by a computer at ML's corporate management which

sorted the FA trainees solely by their success or failure in meeting their performance targets.[3]

Meshel Dep. 153; Meshel Decl. ¶ 13, Ex. A; Kamil Dep. 103–104; *see* Clark Decl. Ex. 8.  The

list contained seven men and two women, including Wharton and Vuona.  *See* Meshel Decl. Ex.

A; Clark Decl. Ex. 8.  However, two men included on the list were added erroneously;

---

[2] The parties dispute the proper terminology to be applied to this list, in particular whether the computer-generated RIF list was mandatory or presumptive; the latter phrase may connote that there was some degree of flexibility given to the RIF decision-makers.  *Compare* Def. 56.1 ¶¶ 190–193, *with* Pl. 56.1 ¶¶ 620–623, 635; *see also* Oral Arg. Tr. 48.  The Court will refer to the list as "presumptive" throughout this opinion, because that term more accurately describes how the list operated in fact, whether or not it was intended to operate thus.

[3] The presumptive layoff list consisted of POA trainees and Stage II PMD trainees who had completed at least three performance months and who: (1) were off-target on their objective performance hurdles and (2) had failed to meet their hurdles more than 50% of the time.  Meshel Decl. ¶ 13, Ex. A; Clark Decl. Ex. 8.

accordingly, for purposes of considering Plaintiffs' gender discrimination claims, the presumptive list is properly seen as containing five men and two women.  Houston Dep. 130–31, 142–43; Meshel Dep.174–77; Meshel Decl. ¶¶ 17–18; Kamil Dep. 120–21, 171; Roccanova Dep. 158–59.

Three men contained on the presumptive layoff list were subsequently removed from the list after Roccanova and Meshel sought input from ML's regional Human Resources director, Traci Kamil, and the head of the New York City region, Sabina McCarthy.  Roccanova Dep. 154–58; Meshel Dep. 174–77; Meshel Decl. ¶¶ 19–21; Kamil Dep. 111–13; Houston Dep. 120–21, 128–31.  Those three men had the following extenuating circumstances which Kamil, in consultation with McCarthy, determined merited their removal from the presumptive layoff list.  Kamil Dep. 111–17, 123–24, 138–39; Roccanova Dep. 158.

One man (referred to here as "JBC" for reasons of confidentiality) was removed from the list based on documented medical concerns over his fragile emotional state.  Kamil Dep. 114–19; Roccanova Dep. 68, 154, 158; Meshel Decl. ¶ 21.  He had been on and off medical leave and was in contact with ML's Employee Assistance Program, designed to minister to employees in need.  Kamil Dep. 114–19; Roccanova Dep. 68, 154, 158; Meshel Decl. ¶ 21.  He was therefore, temporarily, spared from the presumptive layoff list.  Kamil Dep. 114–19; Roccanova Dep. 68, 154, 158; Meshel Decl. ¶ 21.  JBC's continued tenure at ML was, however, very brief; in April 2009, he resigned.  Kamil Dep. 160; Houston Dep. 109, 164.

Another man removed from the list, Shahe Galstian, had been hired pursuant to an agreement by a female senior FA, Taylor Hanex, for whom he had previously worked when accepted into the training program.  Meshel Dep. 176, Ex. 16; Meshel Decl. ¶ 20; Roccanova Dep. 85–86; Clark Decl. Ex. 63.  She had entered into an agreement with ML contractually

guaranteeing his success (*i.e.*, pledging to pay back ML's investment in him) until July 2009. Meshel Dep. 176, Ex. 16; Meshel Decl. ¶ 20; Roccanova Dep. 85–86; Clark Decl. Ex. 63.  This agreement required her, among other things, to "guarantee Shahe's PMD goals and hurdles are met each and every month for nine months."  Meshel Dep. Ex. 16; Clark Decl. Ex. 63.  That appears to have meant that Hanex's own credits would be transferred whenever Galstian's fell short, to make up any shortfall for him; as a result, the numbers based on which the presumptive layoff list was generated did not accurately reflect Galstian's numbers, once adjusted upward per his agreement with Hanex.  In July 2009, after that agreement expired, Galstian was terminated for underperformance.  Houston Dep. 110, 168; Kamil Dep. 169.

The third man removed from the presumptive layoff list, Josh Young, had signed and closed a multi-million dollar deal that was slated to hit ML's books shortly after the RIF list was generated, but which was not reflected in ML's records at the time the computer generated the presumptive layoff list.  Meshel Dep. 177, 188; Meshel Decl. ¶ 19; Roccanova Dep. 157; Clark Decl. Ex. 65.  Management was alerted that once the transaction was booked, Young would have met, and indeed exceeded, his performance goals; the deal had not been booked only because it was subject to a mandatory waiting period for 401(k) accounts.  Meshel Dep. 177, 188; Meshel Decl. ¶ 19; Roccanova Dep. 157–58; Kamil Dep. 124; Clark Decl. Ex. 65.  On this basis, Young was removed from the presumptive layoff list.

Wharton and Vuona, and the two males remaining on the presumptive list, were terminated.  In both Vuona's and Wharton's cases, Roccanova delivered the news of the termination.  Roccanova Dep. 180–83; Vuona Dep. 247–250, 263–265; Wharton Dep. 241–42.

## 2.   The Discretionary Layoff List

Once the presumptive layoff list was finalized—*i.e.*, pruned from seven to four people, as described above—the Fifth Avenue branch was obliged, pursuant to the RIF, to terminate an additional nine employees.[4]  Meshel Decl. ¶ 22; *see* Roccanova Dep. 154, 159.  The management of the Fifth Avenue branch, starting with Meshel and Roccanova, was granted discretion in selecting the remainder of FA trainees for termination.  Meshel Dep. 153–55, 165, 169, Exs. 11, 15; Meshel Decl. ¶ 14, Ex. A; Clark Decl. Ex. 8.  (Mattia was not involved in the RIF, because he had left the Fifth Avenue branch on December 1, 2008, before the RIF occurred, *see* Mattia Dep. 20, 139.)  Plaintiffs complain that, rather than looking to the Trainee/Stage I list for the next round of terminations, Meshel and Roccanova instead sought to fill the requisite remaining layoff slots by turning to Stage II of the PMD program, which included Kuo and Hudson.  Meshel Dep. 157–65, 223–24; Meshel Decl. ¶¶ 22–24; Roccanova Dep. 161–62; *see also* Pl. 56.1 ¶¶ 736–801.  During the process of reviewing Stage II trainees, described in greater detail below, *see infra* §§ IV(B)(1), IV(C)(1), IV(C)(3)(a), two of the three women in Stage II of the PMD program—Kuo and Hudson—were chosen for termination.  Meshel Dep. 157–58, 160–61; Meshel Decl. ¶¶ 22–24.  Kuo's termination was communicated to her by Linda Houston.  Kuo Dep. 272.  Hudson was informed of her termination by Anna Roccanova.  Hudson Dep. 299.  After Kuo and Hudson were selected, the branch was seven positions short of its target number for the RIF.

---

[4] The branch needed only nine, rather than ten, additional employees at that point to reach its target of 14 because one male employee who was captured by the presumptive layoff list, and thus would have been terminated—Theodore Worthington—was already in the process of separating from ML at the time of the RIF.  Def. 56.1 ¶ 221.  The Court here includes him in its total count because, as a result of Worthington's separation, management was not required to select another employee to be terminated in his place; Worthington was counted toward the required RIF headcount of 14.  *Id.* ¶ 222.

Branch management then turned to the Trainee and Stage I lists to fill the remaining seven RIF slots.  Meshel Dep. 169; Meshel Decl. ¶ 27; Roccanova Dep. 163.  Although the decisions made in the last round of RIF determinations are not strictly relevant to Plaintiffs' terminations, because none of them were Trainees or in Stage I and because their terminations had already been decided upon, Plaintiffs complain that the overall RIF had a disparate impact by gender. They observe that seven of the eight women in the FA trainee program lost their jobs and that ML retained 16 FA trainees, of whom 15 were men and only one was a woman.  *See* Clark Decl. Ex. 5.

The RIF was announced on January 26, 2009.  *See* Clark Decl. Ex. 60.  Management had been given, and took, four days (covering a holiday weekend) to produce the final RIF list. Meshel Dep. 154–155, 162; Meshel Decl. ¶¶ 12, 15; Houston Dep. 117–19, 135; Kamil Dep. 107, 110–11.

## II.    Procedural History

On September 2, 2012, Plaintiffs filed the Complaint in this case.  Dkt. 1.  On October 22, 2010, ML filed its Answer.  Dkt. 8.  After the close of discovery,[5] ML moved for summary judgment.  In a letter to the Court dated April 11, 2012, ML requested leave from the Court to file two separate memoranda of law in support of its motion for summary judgment.  The Court granted ML leave to do so.[6]

On May 15, 2012, ML filed its motion for summary judgment on the claims of Vuona and Wharton, Dkt. 31, and its supporting memorandum of law ("Def. VW Br."), Dkt. 32.  Also on May 15, 2012, ML filed its motion for summary judgment on the claims of Kuo and Hudson,

---

[5] On November 15, 2011, the Court issued an Opinion and Order resolving various discovery disputes in the case.  Dkt. 19.

[6] To assure parity, the Court granted Plaintiffs leave to file a double-length opposition brief.

Dkt. 33, and the memorandum of law in support of that motion ("Def. KH Br."), Dkt. 34.  On

June 18, 2012, Plaintiffs filed their opposition brief ("Pl. Br.").  Dkt. 38.  On July 18, 2012,

Defendants filed their reply brief ("Def. Reply Br.").  Dkt. 49.

That same day, ML filed a motion to strike portions of Plaintiffs' Response to

Defendants' Rule 56.1 Statement of Material Facts, portions of the Plaintiffs' Rule 56.1

Statement of Material Facts, and Plaintiffs' accompanying Declarations, Dkt. 52, along with a

memorandum of law in support of that motion ("Def. MTS Br.").  Dkt. 53.  On August 10, 2012,

Plaintiffs submitted an opposition to the motion to strike ("Pl. MTS Br.").  Dkt. 56.  On August

22, 2012, ML submitted a reply brief in support of the motion to strike ("Def. MTS Reply Br.").[7]

Dkt. 58.

On December 6, 2012, the Court heard oral argument on the motion for summary

judgment.

## III.   Applicable Legal Standards

A court should grant summary judgment only when the submissions, taken together,

"show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

bears the burden of demonstrating the absence of a material factual question; in making this

determination, the court must view all facts "in the light most favorable" to the non-movant.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d

130, 132 (2d Cir. 2008).  To survive a motion for summary judgment, the opposing party must

establish a genuine issue of material fact by "citing to particular parts of materials in the record."

Fed. R. Civ. P. 56(c)(1).  "A party may not rely on mere speculation or conjecture as to the true

---

[7] In resolving the motion for summary judgment, the Court addresses the motion to strike only to
the extent the underlying assertions are relevant to the analysis herein.

nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010).

## IV. Plaintiffs' Gender Discrimination Claims Under Title VII

In seeking summary judgment in its favor, ML first argues that Plaintiffs cannot make out a *prima facie* case of gender discrimination under Title VII. Def. VW Br. 3; Def. KH Br. 3. ML next argues that even if Plaintiffs have made out such a case, they have not adduced sufficient facts to give rise to an inference that ML's stated nondiscriminatory reasons for terminating them as part of ML's RIF in fact were a pretext for gender discrimination. Def. VW Br. 14–17; Def. KH Br. 13–15. Plaintiffs oppose summary judgment, arguing that there are genuine issues of

material fact as to whether their gender was a factor in their terminations, and whether ML's stated reasons for including Plaintiffs in its January 2009 RIF were pretextual.  Pl. Br. 12, 27. For the reasons that follow, the Court concludes that the Plaintiffs, narrowly, have made out a *prima facie* case, but that they have not adduced sufficient facts to give rise to an inference that ML's proffered nondiscriminatory reasons for including Plaintiffs in the RIF were a pretext for gender discrimination.

### A.  Vuona's and Wharton's Title VII Claims

In analyzing claims of gender discrimination under Title VII in cases where there is no direct evidence of gender discrimination, courts apply the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  To do so, a plaintiff must point to evidence in the record showing that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for and competent at her position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination based on plaintiff's membership in the protected class.  *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).  In employment discrimination cases, the burden of establishing a *prima facie* case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009); *McGuiness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

If the plaintiff can demonstrate a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for having undertaken the adverse action.  *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

Thereafter, "[i]f the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination." *Id.* (citation omitted).  However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253.

  **1.  *Prima Facie* Case**

  The parties do not dispute that Vuona and Wharton have made out the first three elements of a *prima facie* case.  *See* Def. VW Br. 3; Pl. Br. 12.  They diverge as to the fourth element: whether the adverse employment action (here, Vuona's and Wharton's terminations) took place under circumstances that give rise to an inference of discrimination.  Plaintiffs argue that an inference of discrimination arises, alternatively, from (a) the allegedly disparate impact of the RIF decisions on male and female employees (a numerical/statistical argument), Pl. Br. 14–17, (b) the exclusion from the RIF process of men whom Vuona and Wharton claim are "proper comparators" of theirs, Pl. Br. 27–37, and, (c) more generally, what they claim was pervasive gender bias at ML, Pl. Br. 19–26.  In arguing that these Plaintiffs have failed to make out a *prima facie* case, ML contends that they have not shown that any similarly situated male was treated differently from them, Def. VW Br. 3–7, and that neither the statistical nor the anecdotal evidence mustered by Plaintiffs permits an inference of discrimination, particularly given that it was a computer, not a subjective decision-maker exercising discretion, that placed Vuona and Wharton on the initial RIF list.  Def. VW Br. 7–13.

  Plaintiffs are correct that their proffered evidence is sufficient, albeit by a small margin, to permit the inference of discrimination required to make out the fourth element of a *prima facie* case.  The "minimal" burden of establishing a prima facie case, *see St. Mary's Honor Ctr.*, 509

U.S. at 506, can be satisfied in a variety of ways. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502–03 (2d Cir. 2009); *see also Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38–40 (2d Cir. 1994). Here, Plaintiffs have put forward statistics that show that male employees were more likely to survive ML's RIF. The raw numbers are not meaningfully in dispute. Specifically, seven out of a total of eight female FA trainees at ML's Fifth Avenue Branch were terminated during the RIF, while only seven[8] out of 20 male FA trainees were terminated. *See* Pl. 56.1 ¶ 834; Def. 56.1 ¶ 289; Def. Response to Pl. 56.1 ¶ 834; Oral Arg. Tr. 36. These statistics substantially assist Plaintiffs in establishing a *prima facie* case.

Plaintiffs seek to bolster their *prima facie* case by noting that there were male employees who, like Vuona and Wharton, were captured by the computer-generated RIF list but whom the decision-makers at the Fifth Avenue branch removed from the list for various reasons. The fourth element of a *prima facie* case may be established by demonstrating that an "employer subjected [an employee] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). Vuona and Wharton were indeed included on the presumptive layoff list for strictly objective reasons: They were among the trainees who were off-target in their performance hurdles as of the time of the RIF and who had been off-target more than 50% of the time. But this objective mechanism for identifying the employees to be terminated was, later in the process, supplemented by subjective, discretionary decision-making. As Plaintiffs emphasize, three men originally included on the presumptive layoff list—JBC, Galstian, and Young—were later removed from

---

[8] The number of male trainees terminated can alternatively be viewed as six or seven, as described *supra* note 4, depending on whether Theodore Worthington is counted. The ensuing analysis applies equally whether or not Worthington is treated as having been terminated pursuant to the RIF.

that list and survived the RIF.  To be sure, ML argues that these individuals were not similarly situated to Plaintiffs; ML identifies various—and defensible—arguments for their retention.  But the fact remains that the only trainees initially captured by the presumptive layoff list who evaded termination pursuant to the RIF were males, and that they were spared as a result of subjective human intervention.  Thus, although ML may be correct that the RIF-spared male trainees are not comparators "similarly situated in all material respects" to Vuona and Wharton, *see Graham*, 230 F.3d at 38–39, and although ML's justifications for sparing these male trainees are fairly considered in addressing the later question under the *McDonnell Douglas* framework of whether ML had a legitimate non-discriminatory reason for terminating Vuona and Wharton, the use of subjective considerations uniquely to spare trainees is an additional basis, at the *prima facie* stage, for permitting an inference of discrimination.

Finally, Plaintiffs argue in support of their claim to have made a *prima facie* case of gender discrimination that there is anecdotal evidence of pervasive cultural gender bias at ML's Fifth Avenue branch.  This bias, Plaintiffs argue, inevitably tainted the perspectives of the RIF decision-makers.  Plaintiffs cite Vuona's having been asked to answer Mattia's telephone early in her tenure at ML as evidence of gender stereotyping; they point to the Seducing the Boys Club book event as indicative of gender stereotyping and bias at ML; and they recount comments by Roccanova that they believe demonstrate a bias against women, including her scolding Vuona for not being "perky" enough upon answering the phone and offering Vuona a tissue upon her termination so her "mascara [wouldn't] run."  Pl. Br. 20–24.

These incidents, considered alone, would not suffice to permit an inference that the RIF process was skewed by gender bias.  And the first two incidents are of questionable relevance even at the *prima facie* stage, because Mattia was no longer an employee of ML's Fifth Avenue

branch at the time of the RIF.  *See* Mattia Dep. 20, 139; Def. VW Br. 17–18.  However, taken together, these incidents add modest incremental support to Plaintiffs' statistical and comparator evidence, recounted above, on the issue of whether there is evidence based on which a *prima facie* case of gender discrimination could be found.  The comments attributed to Roccanova, in particular, may be legitimately argued to reveal that she harbored a bias against women that may have affected her decisions during the RIF process.  *See, e.g.*, *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115–16 (2d Cir. 2007).  To be sure, these comments are far from conclusive on the point, and, as discussed *infra* at pp. 27–33, they do not materially assist Plaintiffs in arguing that ML's bases for terminating Vuona and Wharton were pretextual.  But, for purposes of the threshold *McDonnell Douglas* inquiry, these comments add a modicum of support, however small, to Plaintiffs' *prima facie* case.  For these reasons, Vuona and Wharton have adduced sufficient evidence to permit an inference that discrimination played a role in their terminations.  Because they have met the first prong of the *McDonnell Douglas* framework, the burden of production shifts to ML to articulate legitimate, non-discriminatory reasons for Vuona's and Wharton's terminations.

### 2.  ML's Legitimate, Non-Discriminatory Reasons for Termination

ML has come forward with legitimate, non-discriminatory reasons for Vuona's and Wharton's terminations.  It is undisputed that their terminations were a part of a larger, nationwide RIF throughout ML that was necessitated by the trying economic circumstances in late 2008 and early 2009.  A RIF can indeed provide a legitimate, non-discriminatory reason for a termination.  *Duncan v. N.Y.C. Transit Auth.*, 25 F. App'x 14, 16 (2d Cir. 2002 (citation omitted)); *see also Delaney v. Bank of America Corp.*, No. 11 Civ. 8151 (PAE), 2012 WL 6135630, at *8 (S.D.N.Y. Dec. 11, 2012) (collecting cases); *Benson v. Otis Elevator Co.*, No. 10

Civ. 3246 (PAE), 2012 WL 4044619, at *9–10 (S.D.N.Y. Sept. 13, 2012); *Moccio v. Cornell Univ.*, No. 09 Civ. 3601 (PAE), 2012 WL 3648450, at *35–36 (S.D.N.Y. Aug. 27, 2012).  ML has further demonstrated that, at least in the first instance, it employed an objective, performance-based methodology in executing the RIF.  The presumptive layoff list which captured Vuona and Wharton was a computer-generated selection of off-target employees who had failed, more than 50% of the time, to meet their performance hurdles.  Neither Vuona nor Wharton disputes that those criteria applied to them.

### 3.  Vuona's and Wharton's Argument That ML's Reasons Were Pretextual

Vuona and Wharton dispute the reliability of the criteria used in generating the RIF list.  They also emphasize subjective decisions by branch decision-makers in the course of this process, including to remove, and to retain at least temporarily, certain male trainees whose names appeared on the computer-generated presumptive layoff list.  According to Vuona and Wharton, a reasonable jury could find ML's purported justifications for terminating them, while sparing those employees, to be pretextual.  They argue that a jury could find pretext based on: (1) statistical evidence that can be read to show that the RIF disparately affected women; (2) the discretionary decisions made to except certain men from the presumptive layoff list, and not to consider comparable claims that could be made on their behalfs as to why their business "pipelines" merited retention; and (3) evidence of a gender-biased culture at ML, as illustrated by Mattia's alleged sexist acts, Roccanova's isolated comments to Vuona, and what Plaintiffs view as "barriers to success" that women faced at ML.  The Court addresses each of these arguments in turn.  Considered separately and together, these arguments fall well short of demonstrating pretext and thus of raising a genuine issue of material fact on Vuona's and Wharton's claims that they were terminated as a result of gender discrimination.

19

a.  **Numerical Disparity**

In all, ML's January 2009 RIF resulted in the termination of seven of eight female FA trainees at the Fifth Avenue Branch.  Vuona and Wharton argue that this number is compelling evidence that gender discrimination played a role in ML's RIF.  Plaintiffs are correct that statistics are relevant to support a discrimination claim even in a disparate treatment case.  *See, e.g.*, *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 291–92 (S.D.N.Y. 2001); *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 877 (2d Cir. 1997) (citations omitted); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 503 (2d Cir. 2009).  However, the cases on which these Plaintiffs rely largely find such statistics determinative at the *prima facie* stage of the analysis, rather than in the later inquiry into pretext.  And none presents a situation akin to the one here, where the same, or very nearly the same, number of male as female employees were terminated as part of a RIF.

In the case of the January 2009 RIF at issue here, the raw statistics presented fall far short of permitting an inference of gender discrimination.  Statistical analysis is rarely "sufficient to defeat summary judgment.  Although a generalized statistical analysis of selections in a RIF can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale for eliminating Plaintiff's position is false, or that her . . . gender was the real reason for her termination."  *Zito v. Fried, Frank, Harris, Shriver & Jacobson*, 869 F. Supp. 2d 378, 395–96 (S.D.N.Y. 2012) (citing *Robinson v. Metro–North Commuter R.R.*, No. 94 Civ. 7374 (JSR), 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998) (holding that "while statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case . . . the Court is aware of no case where generalized statistical evidence has been held sufficient to

refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a non-discriminatory explanation for a particular act complained of")).

The statistics offered by Vuona and Wharton are insufficient to prove pretext. Plaintiffs emphasize that almost all female FA trainees were terminated. But this statistic is misleading. First, the relevant universe is small: 28 employees were under consideration for the RIF as FA trainees, and 14 were eventually laid off. This small sample size counsels against heavily weighting statistical evidence. *See Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 192 (S.D.N.Y. 1996) ("[F]or statistical evidence to be probative, the sample must be large enough to permit an inference that . . . gender . . . was a determinative factor in the employer's decision."). Second, the numbers are readily capable of being viewed as entirely non-indicative of discrimination: although seven out of eight female trainees were terminated, half of those terminated as a result of the RIF were men. Plaintiffs point out, *see* Oral Arg. Tr. 37, that there were fewer female trainees to begin with, but, given the small sample size and the equal numbers of male and female terminations that resulted, this statistic reveals little. Finally, and by far most important, it is undisputed that a computer, and not a person, targeted Vuona and Wharton, and other underperforming trainees, for termination; and that the computer did so based on statistical performance metrics. For these reasons, a jury could not reasonably find, on the basis of the statistics mustered by Vuona and Wharton, that ML's nondiscriminatory justifications for terminating them were pretextual.

### b. Discretionary RIF Decisions

It is undisputed that ML removed three men from the presumptive layoff list. ML argues that each of these three men was removed based on individualized explanations or extenuating circumstances that do not apply to Vuona or Wharton, and thus none is "similarly situated in all

material respects," *Graham*, 230 F.3d at 38–39, to Vuona and Wharton in a way that makes them proper comparators.

JBC was removed from the presumptive layoff list due to grave medical concerns.  JBC had been in contact with the Employee Assistance Program ("EAP"), which expressed concerns that JBC was suicidal.  EAP recommended that Kamil, ML's HR Director, remove JBC from the presumptive list.  *See* Kamil Dep. 116–19.  Kamil heeded that recommendation and removed him from the termination list.  Neither Vuona nor Wharton has claimed similar circumstances or seriously disputes that these circumstances justified removal of JBC from the list.

Shahe Galstian was removed from the presumptive layoff list and survived the January 2009 RIF.  Galstian was the beneficiary of a preexisting "sponsorship" agreement with a female FA named Taylor Hanex.  *See* Meshel Dep. 176, Ex. 16; Meshel Decl. ¶ 20; Roccanova Dep. 85–86; Clark Decl. Ex. 63.  Hanex had worked with Galstian before his becoming an FA trainee, and—well before the RIF—had "guaranteed" Galstian's success with management in order to induce them to accept him into the training program.  Meshel Decl. ¶ 20; Roccanova Dep. 85–86. Hanex had committed that, to the extent that Galstian failed to meet his hurdles, Hanex would transfer her production credits and assets to him, to make up any shortfall.  *See* Clark Decl. Ex. 63; Oral Arg. Tr. 51–54, 77–78.  The sponsorship agreement was due to expire in July 2009.  *See* Clark Decl. Ex. 63; Meshel Dep. Ex. 16.  The RIF decision-makers chose to except Galstian from the presumptive layoff list, because the data on which the computer had relied in compiling the presumptive RIF list had failed to take into account the agreement, which would have the effect of boosting Galstian's numbers to a point where he would survive the RIF.  *See* Meshel Dep. 176, Ex. 16; Meshel Decl. ¶ 20; Roccanova Dep. 85–86; Clark Decl. Ex. 63.  Neither Vuona nor Wharton has asserted that she was protected by a similar contractual arrangement.  To

be sure, as Plaintiffs note, Galstian's self-generated numbers were substandard, and supervisors, including Hanex herself, had expressed great dissatisfaction with his performance. *See* Clark Decl. Exs. 61, 62; Roccanova Dep. 203–07; Meshel Dep. 210–12; Kamil Dep. 141–45. But he was entitled, under the agreement with Hanex, to the benefit of the production credits and assets to be transferred from her. Although Plaintiffs criticize ML's decision to spare Galstian from RIF termination based on his credit-sharing agreement with Hanex, their having done so does not give rise to an inference that the decision to spare him—and more importantly, to terminate them—was made on the basis of gender. And subsequent events belie any such notion: Galstian was terminated after his agreement with Hanex expired, *see* Kamil Dep. 169; Houston Dep. 110, 168, in July 2009, confirming that his contractual arrangement with Hanex, not his gender, enabled him to escape termination under the RIF.

Vuona and Wharton, finally, claim that the treatment of trainee Josh Young reveals gender discrimination. ML's explanation for removing Young from the presumptive layoff list was that, as of the time of the RIF decision, he had signed and closed business that was slated to transfer to ML the month after the RIF. This multi-million dollar 401(k) account, which was subject to a 90-day mandatory waiting period, would make Young's performance numbers satisfactory—well above those needed to survive the RIF.[9] In recognition of that fact, and of the significance of the business Young had landed, Roccanova, Meshel, and Kamil removed Young from the presumptive layoff list. *See* Meshel Dep. 177, 188; Meshel Decl. ¶ 19; Roccanova Dep.

---

[9] The record shows that in December 2008, Young was 22,384.14 short on cumulative PCs and $234,104.61 short on fee-based assets. *See* Meshel Dep. Ex. 32. This 401(k) account, which was worth more than $3 million when it first converted to ML, was expected to, and ultimately turned out to, be worth $7 million. *See* Meshel Decl. ¶ 19; Clark Decl. Ex. 65. Measured even at the lower, $3 million level, the 401(k) account easily elevated Young's performance numbers above the target level, negating a necessary criterion for the presumptive layoff list.

157–58; Kamil Dep. 124; Clark Decl. Ex. 65.  This factor comfortably distinguishes Young's

case from those of Vuona and Wharton.  Neither has pointed to any signed and closed business,

existing at the time of the RIF but not considered in fashioning the presumptive layoff list, let

alone business which, if included, would have enabled her to meet her performance hurdles.[10]

---

[10] *See, e.g.*, Vuona Dep. 268–69 ("Q: [A]t the time of the layoff, while you thought that your
performance would improve, you did not have any proof or guarantee that would happen,
correct? A: I couldn't predict the future on what accounts would come in.  Q: It is not a situation
where you had already landed a significant account, where the paperwork was done and it was
just transferring, took time to transfer to Merrill, correct?  A: [N]o. . . . [I]f the money is not there
that day, it is not coming in.").  In her declaration, Vuona alludes to clients who had invested
money with her in cash or cash equivalents but whose money she had not invested in the market,
because of the poor market conditions prevailing at the time.  Vuona Decl. ¶ 17.  Vuona also
refers to "several clients who had additional assets available for investment at Merrill Lynch."
*Id.* at ¶ 20.  Even if construed as not inconsistent with her deposition testimony as cited above
and therefore properly considered on a motion for summary judgment, *see Palazzo ex rel.
Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (citing *Perma Research & Dev. Co. v. Singer
Co.*, 410 F.2 572, 578 (2d Cir. 1979)), neither of these statements suggests that Vuona in fact had
signed and closed business, of which management knew, anywhere near the level of certainty of
Young's 401(k) account.  Vuona separately points to assets that were redistributed to her in
January 2009, just before the RIF, that she now claims were not reflected on her "Household
Opportunity Report," Vuona Decl. ¶ 18.  However, this statement directly contradicts Vuona's
prior deposition testimony, above; as such, it is inadmissible.  *See Palazzo*, 232 F.3d at 43.  In
any event, Vuona, tellingly, does not testify that the RIF decision-makers were aware of such
uncounted assets at the time that they decided to spare Young but not her—she testifies only that
Roccanova was aware of the assets she held in cash or cash equivalents and planned to invest
once the market improved, Vuona Decl. ¶ 14, and that she had prepared a client list before she
was terminated that included some of those accounts (but she does not testify as to who saw
those lists).  *Id.* ¶ 18.  Absent evidence of such knowledge, the decision to terminate Vuona
cannot fairly be viewed as an act of disparate treatment on account of gender, let alone gender
discrimination.

Wharton, for her part, mentions in her declaration a prospect that she was told to "hold off
pursuing" until after the merger, *see* Wharton Decl. ¶ 10—a client who had begun to transfer
assets but temporarily had "paused" due to market conditions.  *See* Wharton Decl. ¶ 13.  She also
testifies that she had meetings scheduled with prospects who planned to transfer assets to Merrill
Lynch.  *See id.* at ¶¶ 14–16.  But, unlike Young's, none of these potential accounts qualifies as
"signed and closed business."  It is, further, fair to infer that the business generation of many FA
trainees was adversely affected by the market downturn of late 2008 and early 2009.  ML's
decision, in deciding whether trainees on the presumptive list should be spared, to consider only
signed and closed business, and to exclude "paused" or potential business for all employees, is
not, without more, an act connected to the trainee's gender.  Wharton separately claims in her

Young, too, then, is not similarly situated to Vuona and Wharton, such that his removal from the presumptive layoff list while Vuona and Wharton remained can fairly be attributed to his gender.

Put differently, although whether two employees are similarly situated is ordinarily a question of fact to be resolved by a jury, plaintiffs at least "must provide an objectively identifiable basis for comparability." *Goldman v. Admin. for Children's Servs.*, No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007).  Plaintiffs have not done so here, as to JBC, Galstian, or Young.  On the summary judgment record, there is nothing about the circumstances of those three men's removal from the presumptive layoff list that could lead a reasonable trier of fact, based on evidence and not speculation, to conclude that they were spared, and Vuona and Wharton terminated, on the basis of gender.

Plaintiffs do assail ML's decision to differentiate between a trainee's "signed and closed business," which it added to Young's performance numbers, and the potential but uncertain business of other trainees like Vuona and Wharton, which it did not.  *See supra* note 10.  In this vein, Plaintiffs fault Roccanova for "not request[ing] any special consideration for Wharton or Vuona or consider[ing] the business they had coming in." Pl. Br. 29.  But this critique does not reveal gender discrimination.  Although Vuona and Wharton appear to have had credible arguments as to why their performance and business generation were likely to improve in 2009, *see* Pl. Br. 30–31, as each admitted in her deposition, neither was in the position that Young was, of having substantial, ironclad completed business that (upon completion of the 401(k) waiting

---

declaration that the documentation produced by ML does not accurately reflect her performance at the time of the RIF, *see* Wharton Decl. ¶ 11, but she has not specifically described these assets or explained why they should have shown up on her record, let alone alleged, with a foundation of knowledge, that the RIF decision-makers were mindful of these additional assets.

period) was sure to post shortly.[11]  ML's decision to consider Young's signed and closed

business, but not Vuona's and Wharton's pipelines, was a permissible business judgment, and

"[t]he Court does not sit as a super-personnel department that reexamines an entity's business

decisions."  *Martin v. MTA Bridges & Tunnels*, 610 F. Supp. 2d 238, 251 (S.D.N.Y. 2009)

(citation omitted).  Nor have Plaintiffs supplied any evidence that ML's use of that distinction

was a pretext to implement gender discrimination, or that ML implemented that distinction

inconsistently, based on gender.

 "In determining whether the articulated reason for the [adverse employment] action is a

pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated

purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether

the articulated purpose is the actual purpose for the challenged employment-related action.'"

*Pearson v. Merrill Lynch*, No. 10 Civ. 5119 (RJS), 2012 WL 983546, at *5 (S.D.N.Y. Mar. 22,

2012) (citing *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993)).  As Vuona

herself acknowledged in her deposition, whether or not ML utilized the right criteria in selecting

employees for the RIF is a question of business judgment.  *See* Vuona Dep. 285.  There is no

evidence to suggest that ML's decision to credit Young's signed and closed business, while not

adjusting Vuona and Wharton's performance numbers, was anything other than a reasonable and

valid business judgment, let alone a pretext for gender-based discrimination.

---

[11] During Wharton's deposition, when asked, "[W]as there business that had been signed,
completed business that did not appear in your numbers as of the time of the layoff," her
response was "Not that I know of."  Wharton Dep. 293–294.  Vuona similarly answered the
question "[A]t the time of your separation did you have any signed business that was completed
but had not yet posted at Merrill?" with a "No."  Vuona Dep. 120.  *See also* Vuona Dep. 268
("Q: It is not a situation where you had already landed a significant account where the paperwork
was done and it was just transferring, took time to transfer to Merrill, correct?  A: [N]o.").

### c.   Evidence that Gender Bias Pervaded ML's Culture

Plaintiffs finally attempt to show pretext by pointing to a handful of incidents or practices at ML that they assert evidence gender bias on the part of senior managers.  This bias, Plaintiffs argue, affected the termination decisions made by Meshel and Roccanova or, alternatively, hindered the ability of women to succeed at ML, thus indirectly accounting for the disproportionate number of female employees selected for inclusion in the RIF.

Plaintiffs point first to the incident in which Vuona was assigned telephone-answering duty.  They argue that incident reflects gender stereotyping and could lead a reasonable jury to conclude that Plaintiffs were terminated due to gender.  But this incident, even if established by competent evidence, is of little relevance.  It is undisputed that Mattia, the administrator whose conduct is assailed in this incident, had left ML by December 1, 2008, and had no involvement in the RIF decision-making process, including the selection of Plaintiffs for inclusion in the RIF.  In any event, the evidence that Mattia preferred to have "girls" answer his phone is inadmissible hearsay.  This preference was attested to only by Vuona, who stated that she had learned of it from Mattia's assistant, Ditaranto, from whom the Court has not received testimony.  As such, Ditaranto's statement is hearsay.  It cannot be offered to prove the truth of the assertion and cannot be used for this purpose at summary judgment.  *See Ridlinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011).  And there is no evidence in the summary judgment record to the effect that Vuona was asked to answer the phone because she was a woman.  With the secondhand comment attributed to Ditaranto excluded, Plaintiffs are left only with a conclusory claim that gender bias motivated Mattia to task Vuona with answering the telephone.

The other senior manager to whom Plaintiffs seek to ascribe a discriminatory motive is Roccanova.  Roccanova, unlike Mattia, was a crucial, if not *the* crucial, decision-maker with

regard to the RIF.  *See, e.g.*, Oral Arg. Tr. 39 ("[T]he key decision-makers were Mr. Meshel and Ms. Roccanova"); *Id.* at 14–15 ("[W]e had Meshel and Anna [Roccanova], who were involved with Houston in getting the presumptive list.  She relied a lot on their knowledge.").  Plaintiffs attempt to demonstrate that Roccanova was biased, based on two comments attributed to her and an earlier statement by Mattia.  First, Vuona testified that Roccanova berated her for not being "perky" enough in answering Mattia's phone.  *See* Vuona Dep. 213–215; Compl. ¶ 36.  Second, Vuona testified that, upon her termination, Roccanova handed Vuona a tissue, saying that she "did not want Vuona's mascara to run, even though Vuona was not crying."  Pl. Br. 22; *see also* Vuona Dep. 227–28.  Plaintiffs argue that these incidents bespeak gender bias on Roccanova's part.

Neither incident, however, considered together or separately, is sufficient to permit an inference of gender discrimination on Roccanova's part in connection with the administration of the RIF.  First, Roccanova herself is a woman, and although not conclusive, *see Feingold v. N.Y.*, 366 F.3d 138, 155 (2d Cir. 2004), that fact is relevant to the inquiry.  *See Zito*, 869 F. Supp. 2d at 395 (RIF decision-maker's gender and age precluded an inference of age or gender discrimination).  Second, the connection between these alleged comments and Roccanova's participation in the January RIF is attenuated.  To permit some inference of discriminatory intent, these two comments would need to be related to the adverse employment action in question.  *See, e.g.*, *Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313, at *9–11 (S.D.N.Y. Sept. 30, 2003) (holding causal link between alleged discriminatory remarks and adverse employment action insufficient), *aff'd* 110 F. App'x 160 (2d Cir. 2004).  Presented with isolated comments such as those at issue here, courts have held that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the

action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  Roccanova's "perky" comment to Vuona is clearly "remote and oblique" relative to the termination decision, which occurred months later, and arose in an unrelated context.  The mascara comment, although not temporally remote, post-dated the termination decision.  And it is too oblique to prove, even at a general level, that Roccanova harbored negative views towards women.  In addition to the lack of any nexus to the RIF terminations of Vuona and Wharton, the two comments here are fewer in number than in cases where courts have held such comments sufficient to permit an inference of discrimination in employment.  *See, e.g.*, *Tomassi*, 478 F.3d at 112 ("Tomassi asserted that [her supervisor] made . . . age-related comments to her 'once a month, [or] once every couple [of] months'"); *Aulicino v. NYC Dep't of Homeless Servs.*, 580 F.3d 73 (2d Cir. 2009) (comments at issue were "several" and made by more than one party).

The only other evidence regarding Roccanova on which Plaintiffs rely is a statement which Vuona testifies Mattia made, after the telephone-answering incident involving Vuona.  According to Vuona, after she complained of Roccanova's treatment of her, Mattia told Vuona that Roccanova was "'particularly hard on women' because there were not many female financial advisors when she started with Merrill Lynch."  Vuona Dep. 218; *see* Clark Decl. Ex. 39.  Vuona's account of Mattia's statement, however, would not be admissible at trial for the truth of the matter asserted by Mattia, and therefore cannot be relied upon at the summary judgment phase.  *See Ridlinger*, 651 F.3d at 317.[12]  Plaintiffs dispute that point, arguing that Mattia's statement to Vuona would be admissible as a statement of an agent of the defendant, ML.  *See Idrees v. Beth Israel Hosp.*, No. 03 Civ. 0464 (DLC), 2004 WL 2346666, at *6 (S.D.N.Y. Oct. 19, 2004); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997).

---

[12] Because of the secondhand nature of Mattia's statement, it is also unclear what, if any, basis Mattia had for his opinion as to Roccanova's motivations.

But although Mattia, as director of the Fifth Avenue branch, was assuredly an agent of ML for some purposes, the argument that he was acting as such in making the statement in question is not persuasive.  His statement opining on the basis for Roccanova's alleged "hard" treatment of women was not one "as to [a] matter[] within the scope of [his] duties."  *Id.* at 313.  This generalized statement predating the RIF terminations by months is not analogous to the statements held admissible in *Idrees* and *Stern*, which directly related to the employment action claimed to be discriminatory.  Furthermore, in both *Idrees* and *Stern*, the ultimate declarant of the statement was the same person who was said to have taken, or been actively involved in, the challenged employment action.  That is not true of Mattia, who had left ML well before the RIF and is not claimed to have played any role in it.  Nor does Mattia's opinion about Roccanova's treatment of women, to which Vuona proposes to testify at trial, fall within any other hearsay exception or exclusion.

It bears repeating here that Vuona and Wharton were not affirmatively selected for inclusion in the RIF by Roccanova.  They were chosen by a computer.  To be sure, Roccanova's subjective discretion played a role in the decision to remove several men from the list.  But there is no evidence that any subjective decision as to Vuona and Wharton was made by anyone, let alone Roccanova, in connection with the RIF process.  On the record before the Court, even assuming Roccanova tacitly harbored a bias against women, there is no act in which she engaged which such bias can credibly be said to have affected.

In pointing to incidents allegedly indicative of gender bias at ML, Plaintiffs lastly point to a statement by Meshel to Hudson that she should "stick to her knitting," and to the Seducing the Boys Club event discussed above.  The Court discusses Meshel's statement towards Hudson in more detail below, *see infra* § IV(B)(3)(b), as it relates to Hudson's termination.  For the purpose

of evaluating the claims made by Vuona and Wharton, Meshel's single comment to Hudson is insufficient to raise a genuine issue of material fact as to his reasons for terminating Vuona and Wharton, whom the computer, not Meshel, included on the presumptive layoff list based on their numerically substandard performance.  As to the <u>Seducing the Boys Club</u> event, it is fairly criticized as offensive, as ML's Mattia and Kamil both acknowledged in their depositions.  *See* Mattia Dep. 137–38; Kamil Dep. 72.  But this event was hosted by Mattia, who was gone from ML in January 2009 and had no involvement whatsoever in Plaintiffs' terminations.

Plaintiffs cite *Slattery v. Swiss Reinsurance America Corporation*, 248 F.3d 87 (2d Cir. 2001), for the proposition that "discriminatory messages from top management set the tone for the whole office," Pl. Br. 24, but they do not convincingly demonstrate that the evidence of discriminatory messages here is sufficiently deep or pervasive to enable Plaintiffs to survive summary judgment.  Notably, even in *Slattery*, where evidence of corporate culture from the statements of top executives was held to have "probative value as to possibly discriminatory acts on the part of the lower level supervisors" toward establishing a *prima facie* case, that evidence was held insufficient to prove that the employer's performance-based explanations for terminating Slattery were pretextual.  *See Slattery*, 248 F.3d at 93–94.  The same conclusion follows here, where Vuona and Wharton were terminated along with many others in a company-wide RIF, after being selected for inclusion by a computer based on numerical performance metrics.  Put differently, the <u>Seducing the Boys Club</u> event, although validly assailed as inappropriate, does not call into question the neutrality of the decision to terminate Vuona and Wharton.

Vuona and Wharton make a final "lost opportunity" argument—that "barriers to success" at ML prevented them from performing at higher levels.  The evidence they have mustered to

this end, however, even considered in the light most favorable to Plaintiffs, is insufficient as a matter of law to support such a conclusion. Vuona and Wharton each cite one instance in which a male colleague, Craig Evans, allegedly failed to assist her in bringing in business. They have adduced no evidence, however, that either of these experiences had anything whatsoever do with gender. Rather, the only reasonable conclusion that a trier of fact could draw from them is that Evans, a banker at ML from whom both Vuona and Wharton at various points sought help, was not a helpful, collaborative colleague to these Plaintiffs.[13]

Vuona and Wharton do claim more generally that teaming and mentoring opportunities were denied them at the branch. They claim that management facilitated teaming among male employees, which was an important ingredient to success at ML, but did not do so among female employees. Pl. Br. 40–41; Compl. ¶ 30. They also claim that management was slower to assign mentors to the female FA trainees than to the male trainees. Pl. Br. 40–41. But Plaintiffs have not adduced evidence to support these claims. With regard to teaming, neither Vuona nor Wharton could point to a specific instance in which management—as opposed to individual FAs or trainees—formed a team. *See* Vuona Dep. 148–50; Wharton Dep. 192–93. And in fact,

---

[13] At Vuona's deposition, when asked why she believed her colleague Evans had originally been uninterested in the opportunity she brought to him, telling her to attend the initial meeting by herself, she responded: "[H]e didn't take . . . the opportunity seriously" until he realized "he would make money." Vuona Dep. 236. The only reasons she offered for believing that his underestimating the opportunity initially was due to her gender were that: "there aren't a lot of women to look to in the office that are . . . seen as . . . successful in the program [which] colors someone's idea of what's a good opportunity," and that "it seemed like [Craig Evans and another colleague, David Gray] were helping a lot of the male trainees, and I never saw them once speak to the women trainees." Vuona Dep. 236–37. But when asked whether she ever saw them refuse to speak with female trainees, Vuona answered that she had not. *Id.* at 237. Wharton adduced even less evidence that Evans' lack of support and assistance related to her gender. She testified simply that "he did not communicate effectively" and failed to follow up when she had reached out to him. Wharton Dep. 160–68. A reasonable factfinder could not find, on the basis of these incidents, that, because of their gender, Vuona and Wharton were inhibited from succeeding at ML.

Wharton herself teamed on occasions with other employees, who, with Wharton, took the initiative to band together.  *See* Wharton Dep. 174–87.  As to mentors, both Vuona and Wharton had assigned mentors while at ML, *see* Vuona Dep. 102–03; Wharton Dep. 140–41, and neither has complained that it took too long for them to be assigned mentors.  *Cf.* Kuo Dep. 146; Kuo Decl. ¶ 5; Hudson Dep. 183.

For all these reasons, Vuona and Wharton have not put forth sufficient evidence of pretext to rebut ML's legitimate, nondiscriminatory reasons for their terminations as part of the RIF.  ML's motion for summary judgment as to the Title VII discrimination claims of Vuona and Wharton is, therefore, granted.

### 4.  Vuona's Retaliation Claim

Vuona's retaliation claim is that Roccanova caused her to be terminated in retaliation for Vuona's earlier complaints about Roccanova.  At the threshold, ML argues that Vuona failed to exhaust administrative remedies as required in Title VII retaliation claims, because she did not check the box marked "retaliation" on her EEOC Charge, *see* Clark Decl. Ex. 39, and that her claim is therefore procedurally barred.  Def. VW Br. 22; Def. Reply Br. 18–19.  Vuona's failure to mark the "retaliation" box on her EEOC complaint does not categorically preclude such a claim, however.  "Claims not raised in an EEOC complaint . . . may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."  *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1394, 1401 (2d Cir. 1993)).  The key issue is whether "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."  *Williams*, 458 F.3d at 70.

Although the matter is not free from doubt, the Court's assessment is that Vuona's retaliation was fairly subsumed within her EEOC charge, such that investigation into that charge would fairly come to encompass the retaliation claim. Although not using the word "retaliation," Vuona's narrative to the EEOC included a recitation of Roccanova's alleged statement to her that Vuona "would 'not last long' if [she] continued to have an 'uncooperative attitude' about answering the telephone." *See* Clark Decl. Ex. 39 ¶ 12. It also recited that Vuona had reported that statement to Roccanova's boss: Vuona told the EEOC that she had "told Mattia about Roccanova's abusive conduct and asked him about the telephone-answering assignment" and "told Mattia [she] would be glad to answer his telephone if male FAs were also asked to do so." *Id.* And the EEOC complaint challenged Vuona's discharge, the act of retaliation by Roccanova that Vuona challenges here. Although Vuona's preservation of the retaliation claim would have been clearer had she checked the retaliation box or more explicitly alleged that her termination was an act of retribution, these factual allegations, viewed in the light most favorable to Vuona, fairly encompass such a claim. *See, e.g.*, *Williams*, 458 F.3d at 71 (relationship between retaliation claim and gender discrimination claim is "intimately connected to the facts asserted in the EEOC complaint"; allegations in retaliation claim put EEOC on notice of a potential sex discrimination claim). *But see O'Hara v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 99 Civ. 2658 (JSM), 2000 WL 1459798, at *5 (S.D.N.Y. Sept. 29, 2000) (plaintiff's EEOC complaint of age discrimination does not allege sufficient facts for a retaliation claim to fall within its scope), *aff'd*, 27 F. App'x 69, 70–71 (2d Cir. 2001) (summary order).

However, on the merits, Vuona's Title VII retaliation claim falls well short. Retaliation claims are analyzed under the "same burden-shifting framework established for Title VII cases." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *see also Jute v. Hamilton*

*Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  To prove a *prima facie* case of retaliation, a plaintiff must establish: (1) that she participated in a protected activity; (2) that participation in the protected activity was known to the employer; (3) that the employer thereafter subjected her to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  Although the burden of proof at this stage, as in the gender discrimination *prima facie* case, is "de minimis," *Hicks*, 593 F.3d at 166, Vuona has failed to meet it.

Vuona's complaint to Mattia is reasonably portrayed as protected activity; she therefore satisfies the first prong of a *prima facie* case for retaliation.  A complaint against a practice of an employer that an employee has "a good faith, reasonable belief . . . is unlawful" constitutes protected activity.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 111 n.8 (citation omitted).  Vuona's underlying complaint can be fairly portrayed as challenging both the practice of assigning women to answer the telephones at ML, and Roccanova's mistreatment of her in relation to that activity, as violations of Title VII.

Vuona's retaliation claim fails, however, the second and fourth prongs of the *prima facie* standard.[14]  As to the second prong, knowledge by the relevant employer of Vuona's complaint, that complaint was made to Mattia.  Mattia did not participate in the RIF decisions; he left ML before the RIF occurred.  Mattia's knowledge is therefore itself not relevant, without more, to the claim of retaliatory termination.  As for Roccanova, she did participate in the RIF process, but there is no evidence that she was aware of Vuona's complaint to Mattia.  Vuona correctly claims that "general corporate knowledge" is enough to satisfy the knowledge prong of a *prima facie*

---

[14] There is no dispute that Vuona has satisfied the third prong.  She was terminated from ML— the quintessential adverse employment action.

case, and that she need not prove specific knowledge on Roccanova's part, *see Henry v. Wyeth Pharmas., Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010), but she has not adduced facts sufficient to establish such knowledge.  The knowledge of one individual (Mattia) who left the company before the termination decision is not enough, without more, to demonstrate "general corporate knowledge."  The scenarios in which general corporate knowledge can be inferred that the Second Circuit posited in *Henry* are absent here:  The surrounding circumstances simply do not "evidence knowledge of the protected activities," and there is no evidence that a superior with the requisite knowledge encouraged an employee unaware of the protected activity to take adverse action.  *Cf. Cooper v. Conn. Dep't of Corrs.*, 09 CV 691 (MRK), 2009 WL 4345715, at *7–8 (D. Conn. Oct. 19, 2010) (distinguishing *Henry* and a similar case, and noting that, although the Second Circuit has twice held general corporate knowledge sufficient, "in both of those cases, the Court indicated that the lower-level agent who actually carried out the adverse employment action may have acted pursuant to the encouragement of a superior who *did* have personal knowledge of the employee's protected activity").

As to the fourth prong, assuming *arguendo* that Roccanova had known of Vuona's complaint to Mattia about phone-answering practices and about Roccanova's statement to her about her lack of perkiness in answering the phones, that knowledge would give Roccanova a basis to be annoyed at Vuona.   But Vuona has not adduced sufficient evidence to establish a causal link between those events and her later termination during the RIF.  First, Vuona's complaint about Roccanova is alleged to have occurred nine months before the RIF—outside the time frame traditionally considered to allow for an inference of causation.  *See Thompson v. Morris Heights Health Ctr.*, No. 09 Civ. 7239 (PAE), 2012 WL 1145964, at *10 (S.D.N.Y. Apr. 6, 2012) (collecting cases).  Although not dispositive, a time lapse of this duration strongly

undercuts an inference of causal connection.  Second, the mechanics of the RIF compellingly undermine any such claim of causation.  As noted, Vuona was undisputedly identified as a candidate for inclusion in the RIF not by Roccanova, but by a computer on the basis of her subpar performance data.  And there is no evidence that, in the ensuing discussions among the RIF decision-makers about three other employees on the presumptive layoff list and whether facts relating to their mental health (JBC) or corrected performance numbers (Galstian, Young) justified sparing them from the RIF, there was any discussion about Vuona whatsoever.  These facts preclude a reasonable jury from finding that Vuona's termination pursuant to the RIF was caused by any ill will that Roccanova might have harbored towards Vuona had she known of Vuona's earlier complaint.

Vuona's claim that she was terminated due to unlawful retaliation in violation of Title VII therefore fails to present a genuine issue of material fact for trial.  ML's motion for summary judgment as to that claim is granted.

### B. Hudson's Title VII Claim

Like those of Vuona and Wharton, Hudson's Title VII claim fails to raise a genuine issue of material fact.  Consequently, ML's motion for summary judgment as to Hudson is granted.

#### 1. *Prima Facie* Case

Unlike Vuona and Wharton, Hudson was not among the individuals initially selected for termination by the computer that generated the presumptive layoff list.  Instead, Hudson's termination was a component of the second step of ML's RIF:  the selection for termination of Stage II FA trainees who had weak performance records relative to their peers in the same "length of service" ("LOS") groups.  The RIF process that led to Hudson's termination therefore involved at least two subjective, discretionary decisions not present in connection with the

terminations of Vuona and Wharton: (1) the decision to focus next on Stage II trainees as

potential candidates for termination; and (2) the decision within the group of Stage II trainees

with the same LOS as Hudson to terminate Hudson but not others.

In part because of these subjective factors, Hudson has satisfied her minimal burden to

make out a *prima facie* case of gender discrimination.  *See St. Mary's Honor Ctr.*, 509 U.S. at

506.  Hudson has met the fourth prong of the *McDonnell prima facie* step—that her termination

took place under circumstances giving rise to an inference of discrimination based on her gender.

*See Dawson*, 398 F.3d at 216.  First, Hudson has raised a question as to whether ML, turning to

further examine Stage II trainees after exhausting the presumptive layoff list, deviated from the

RIF's intended procedure.  Hudson notes that a pre-RIF communication between ML corporate

management and the Fifth Avenue branch's management suggests that, after the presumptive

layoff list, the branch was to consider next for layoffs the Stage I/Trainee group.  *See* Clark Decl.

Ex. 8; *see also* discussion *infra* at § IV(C)(3)(a).  Instead, management (Roccanova and Meshel,

preliminarily) next proceeded to consider Stage II trainees.  Meshel Dep. 157–65, 223–24;

Meshel Decl. ¶¶ 22–24; Roccanova Dep. 161–62.  The only two Stage II trainees selected for

inclusion in the RIF who were not captured by the computer-generated presumptive layoff list

were female (Kuo, within her LOS cohort of Stage II trainees with six-plus months of

performance data, and then Hudson, within her LOS cohort of Stage II trainees with between one

and three months' data).

An inference of discrimination may arise where an employer deviates from normal

procedures.  *See Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 664 (2d Cir. 2009) (citing

*Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313–14 (2d Cir. 1997)); *Windham v. Time

Warner, Inc.*, 275 F.3d 179, 180 (2d Cir. 2001).  ML disputes that the communication from ML

headquarters to the Fifth Avenue branch was intended to direct that a particular step-by-step sequence be followed.  *See* Def. Response to Pl. 56.1 ¶ 736; Oral Arg. Tr. 39; Def. HK Br. 4–6. However, on its face, the pre-RIF memo can be read to so direct, so as to preclude any finding on that point in ML's favor at the summary judgment stage.  In any event, the decision to focus on Stage II after the presumptive layoff list, rather than first consider the less-experienced Stage I trainees, was a subjective decision by management.  Viewed in the light most favorable to Hudson, that decision can be seen as a departure from the sequence management had required, or at least anticipated, at the outset of the RIF process.

Moreover, the statistical evidence supports a *prima facie* case of discrimination more strongly in Hudson's case than Vuona's and Wharton's.  As noted, the overall raw numbers reflect that seven out of a total of eight female trainees, and seven out of a total of 20 male trainees, were terminated.  *See* Pl. 56.1 ¶ 834; Def. 56. 1 ¶ 289; Def. Response to Pl. 56.1 ¶ 834. Further, when management turned to consider Stage II trainees, it terminated only two people, both women: Kuo alone within her LOS cohort and then Hudson alone within hers.  And, within Kuo's cohort, ranking trainees strictly on the basis of performance data, the trainee ranked immediately below Kuo, and who would thus have been considered before Hudson, Bernard Tsepelman, was male.  *See* Def. 56.1 ¶ 257; Def. HK Br. 6.  That ML drew the line within Stage II LOS 6+ immediately after a woman, Kuo, with the effect that a male employee was not cost his job, and then turned to the Stage II LOS 1–3 cohort where it proceeded to select one woman, Hudson, for termination, comfortably permits an inference of discrimination sufficient to make out a *prima facie* case.

### 2.  ML's Legitimate, Non-Discriminatory Reasons for Termination

ML, however, has provided more than sufficient legitimate, non-discriminatory reasons for Hudson's inclusion in the January 2009 RIF.  Hudson had by far the weakest performance data within the Stage II LOS 1–3 group.  As of January 2009, Hudson had only 3.7 production credits and *zero* annuitized assets.  *See* Hudson Ex. 21; Meshel Dep. 161.  In sharp contrast, the other three Stage II LOS 1–3 employees had, in ascending order, production credits of 506.92, 5,987.84, and 12,678.35, and annuitized assets of $132,492.30, $244,300.57, and $276,501.19. See Meshel Dep. Ex. 24; Meshel Decl. Exs. B, D.  Under these criteria, a reasonable juror would have to conclude that Hudson's performance was by far and away the worst of trainees within her peer group; as such, ML was more than entitled to include her in the RIF.  Although Hudson criticizes ML for not considering her pipeline of prospective and future business, and instead limiting its analysis to booked business, ML's decision to do so was a permissible business judgment that, without more, does not evidence gender discrimination.  Dissatisfaction with an employee's job performance, particularly in the context of a company-wide RIF, is a legitimate reason for termination.  *See Delaney*, 2012 WL 6135630 at *8 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994)).  Hudson's vastly inferior performance data was a legitimate— and valid—reason for ML to terminate her, given its need to terminate additional employees to satisfy the demands of the RIF.  (Indeed, had employees with 1-3 months LOS been eligible for the presumptive layoff list, Hudson's performance assuredly would have put on her that list.)

### 3.  Hudson's Argument that ML's Reasons were Pretextual

To satisfy the third prong of *McDonnell Douglas*, Hudson must show that a reasonable factfinder could find ML's reasons for her termination pretextual, and that its true reason for

terminating Hudson was discriminatory on the basis of gender.  Hudson has not done so.  The Court examines each of Hudson's arguments below.

### a.  Numerical Disparity

As noted, the RIF statistically affected female employees more than males.  But although this statistical skew is relevant evidence and supported the finding of a *prima facie* case, *see, e.g.*, *Shannon*, 156 F. Supp. 2d at 291–92; *Stratton*, 132 F.3d at 877; *Leibowitz*, 584 F.3d at 487, the statistical data here is insufficient to permit a jury to find pretext.  *See Zito*, 869 F. Supp. 2d at 395–96 ("Although a generalized statistical analysis of selections in a RIF can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale for eliminating Plaintiff's position is false, or that her . . . gender was the real reason for her termination."); *Robinson*, 1998 WL 17742 at *9 ("[W]hile statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case . . . the Court is aware of no case where generalized statistical evidence has been held sufficient to refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a non-discriminatory explanation for a particular act complained of.").  Among other reasons, the sample size is quite small, making the statistical skew less probative, and the bottom-line outcome involved the termination of an equal number of men and women.  Particularly in the case of Hudson, where ML's proffered non-discriminatory reasons for termination are compelling in light of her dismal performance data, the numerical disparity of the RIF alone is insufficient to rebut ML's stated performance-based motivation for her layoff.

### b.  Other Evidence of Gender Bias at ML

The other evidence on which Hudson relies fails to create a triable issue as to pretext. Beyond joining in Plaintiffs' claims of overall gender bias at ML, discussed above, Hudson relies on a single incident involving her specifically: an investment opportunity presented to her in December 2008, involving a company called Amkor Green.  Hudson contends that Meshel was dismissive of that opportunity, was condescending in his response to her, and later told Hudson to "stick to [her] knitting."  *See* Hudson Dep. 260–63, 266, 272, 277.

As a threshold matter, the parties dispute the extent to which Hudson's views, expressed during the summary judgment process, about her interpretation of Meshel's comment, may be properly considered.  In opposing summary judgment, Hudson submitted a declaration that alluded to the incident, stating that "Meshel was dismissive of the prospect."  Hudson Decl. ¶ 9. For their part, Plaintiffs' counsel submitted a 56.1 Statement that went beyond Hudson's sworn statements, representing that, when Meshel asked "why would they bring *you* this business?", she, Hudson, "understood [it] to be a reference to her gender."  Pl. 56.1 ¶ 546.  Plaintiffs' counsel added that "she considered the [knitting] remark to be sexist."  Pl. 56.1 ¶ 550.  ML seeks to strike these paragraphs as immaterial and unsupported by any sworn statement by Hudson.  ML further seeks to strike the second paragraph, ¶ 550, because it "contradict[s] Hudson's prior sworn deposition testimony."  *See* Def. Response to Pl. 56.1 ¶ 550.  As ML notes, at her deposition, when asked what she thought Meshel meant by the "knitting" comment, Hudson responded:

> [W]hat I think he meant is stick to bringing in your—your list of people you know and what have you.  I think that's what he meant.  In other words, this other business, you know, was not what I should be doing.  But I didn't think it was an appropriate thing to be saying to me.

Hudson Dep. 266.

The Court agrees with the defense on this point.  In her sworn deposition, Hudson stated under oath that she believed Meshel's "knitting" comment to relate to the type of work "I should be doing," but, despite being asked what she thought Meshel meant by that comment, she did not reply that she understood the comment to be sexist.  Plaintiffs' counsel's 56.1 response to the effect that Hudson understood the comment to be a reference to Hudson's gender, and sexist, contradicts Hudson's testimony.  In any event, this statement as to Hudson's perception is not supported by Hudson's testimony or sworn declaration; it is merely a representation by counsel. For this independent reason, it is inadmissible.  The Court therefore strikes these statements within ¶¶ 546 and 550 of plaintiff's 56.1 response.  *See Holtz*, 258 F.3d at 73–74; *see also Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d 437, 443 (E.D.N.Y. 2012).

To be sure, regardless of how Hudson subjectively perceived Meshel's "knitting" comment, the pertinent issue is whether a finder of fact would understand it to reflect gender bias.  On that issue, Hudson's opinion, while relevant as a percipient witness, is not determinative.  In the Court's assessment, Meshel's statement about "knitting," without other evidence of gender bias on his part, does not so indicate.  To "stick to one's knitting" is a familiar cliche connoting that a person should stay within his area of knowledge or expertise. *See, e.g.*, Adam Mokkai, A Dictionary of American Idioms 336 (2d ed. 1987).  That benign connotation makes logical sense in the context in which Meshel allegedly made that remark. Thus, although comments indicative of bias can supply a basis on which a factfinder can find that an unrelated adverse employment decision was animated by bias, *see Tomassi*, 478 F.3d at 116, Meshel's comment here does not support any such inference.  Further, Hudson's own testimony as to Meshel is consistent with his being a generically unhelpful colleague, as opposed to a sexist one:  Hudson testified that, when she told colleagues that she had gone to Meshel for

help in connection with the Amkor Green business "they told me [he] was a hatchet man.  He was not a helpful person, apparently"; she added that she was unaware of Meshel's helping *any* trainees or FAs.  Hudson Dep. 278–79.  In sum, a factfinder could not find a discriminatory motive on Meshel's part based on Hudson's account of her interactions with him.

Like Vuona and Wharton, Hudson also asserts that there was a gender bias infecting the entire branch, but for the same reasons that Vuona's and Wharton's arguments on this point failed, so too do Hudson's.  Moreover, Hudson testified that she had no negative interactions with Mattia; that she never saw or heard him take any discriminatory actions towards women while at ML, Hudson Dep. 133–34; and that she did not interact at all with Roccanova until she was fired, *id.* at 203.  And the Seducing the Boys Club event of which the other Plaintiffs complain took place before Hudson joined ML.  Hudson also adduced no evidence that she was denied mentoring or teaming opportunities at ML on account of her gender.  On the contrary, there is record evidence that Hudson was in the process of forming a team with Pamela Stern just before her termination; she testified that that team "[a]bsolutely" would have been formed had she not been laid off.  *Id.* at 71, 189.  And, when asked whether she remembered ever asking Mattia to place her on a team, Hudson testified: "No.  I do not have a memory of that. . . . If I asked him and he had refused to put me on a team, I would have remembered that."  *Id*. at 197.  Hudson therefore cannot credibly discount her poor performance data as a product of discriminatory barriers to her success at ML.

Finally, there is no evidence of male comparators to Hudson being treated differently.  No other Stage II LOS 1–3 trainees had nearly as poor performance data as Hudson.  She trailed her next weakest peer, Ryan Alex, by 503.22 PCs and $132,492.30 in annuitized assets.  Her performance metrics were a far cry from those of any trainee who ultimately survived the RIF.

And, as with Vuona and Wharton, there is no basis to regard ML's failure to count Hudson's "pipeline" of potential business as evidence of discriminatory intent. It was within ML's broad business judgment to consider only signed and closed business: "The reasons tendered need not be well-advised, but merely truthful." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 116 (2d Cir. 1988); *see also Martin*, 610 F. Supp. 2d at 251; *Pearson*, 2012 WL 983546, at *5. Although Hudson has identified business that she states she expected to bring to ML,[15] at her deposition, she testified that, as of her termination, she had no signed business that had not yet posted with ML. Hudson Dep. 252–53. Nor has Hudson come forward with evidence of any other employee (male or female) who was retained during the RIF on the basis of a *prospective* pipeline of business.

Because Hudson has not demonstrated a genuine issue of material fact as to whether she was terminated from ML for gender discriminatory reasons, summary judgment is granted in favor of ML on her Title VII claims.

### C. Kuo's Title VII Claim

Of the Plaintiffs, Kuo comes closest to meeting her burden under *McDonnell Douglas*. However, her Title VII claim, too, ultimately falls short of surviving summary judgment.

#### 1. *Prima Facie* Case

For much the same reasons set out in connection with Hudson, Kuo has carried her minimal burden to make out a *prima facie* case.

First, there were subjective decisions in the process that led to Kuo's termination. Like Hudson's, Kuo's name did not appear on the computer-generated presumptive layoff list.

---

[15] In Hudson's declaration, she identifies various business prospects, in paragraphs which ML moves to strike as inadmissible hearsay. *See* Def. MTS Br. 9–11. Because there is no evidence that ML's decision to limit its consideration to signed and closed business was discriminatory, there is no occasion for the Court to resolve this aspect of ML's motion to strike.

Instead, Kuo was selected for termination after management decided, after exhausting their terminations from the presumptive layoff list, next to consider the Stage II LOS 6+ trainees who did not appear on that list.  Kuo has raised a question as to whether, in doing so, ML deviated from the instructions handed down from headquarters, so as to give rise to an inference of discrimination.  *See Weiss*, 332 F. App'x at 649; *Windham*, 275 F.3d at 180.   Kuo argues that the written instructions directed management to consider, after the presumptive layoff list, layoffs among Stage I/Trainee FAs.  *See* Clark Decl. Ex. 8.  Instead, branch management turned, after the presumptive layoff list, to Stage II FAs, terminating Kuo from the Stage II LOS 6+ cohort and Hudson from the Stage II LOS 1–3 cohort; in each cohort, the line was then drawn below that woman, enabling the next weakest performer, a man, to retain his job.

Second, Kuo, like Vuona, Wharton, and Hudson, is aided in her *prima facie* case by the numerical disparity that characterized the January 2009 RIF as a whole, in which the statistical impact of the RIF can be viewed as falling more heavily on women relative to their numbers.

For these two reasons, Kuo has satisfied the *de minimis* requirements of a *prima facie* case of Title VII discrimination.

## 2.  ML's Legitimate, Nondiscriminatory Reasons for Termination

As with the other Plaintiffs, however, ML has sufficiently rebutted Kuo's *prima facie* case.  Within her LOS group, Kuo had the weakest performance record, having met her hurdles during only 50% of her months in Stage II.  Particularly in the context of a RIF, a performance-based reason such as this for a termination is a rational and nondiscriminatory one.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d at 136.  It therefore sufficiently rebuts Kuo's *prima facie* case.

### 3.  Kuo's Argument that ML's Reasons Were Pretextual

Kuo's claim, therefore, turns on the third prong of the *McDonnell Douglas* test—whether the evidence gives rise to a genuine issue of material fact as to whether ML's proffered reasons for her termination were pretextual, and that her termination was in fact related to her gender. The Court discusses each of Kuo's arguments of pretext below.

### a.  Discretionary RIF Decisions

Kuo argues that Meshel and Roccanova's decision, arguably contradicting the directive of management, to consider Stage II FAs for termination before considering the less experienced Stage I/Trainees, demonstrates pretext.  The Court disagrees.  Certainly, as a matter of policy, one can debate the wisdom of terminating more senior employees before less senior ones—particularly where, as in a training program, the company has invested more resources into the senior employees.  But, even viewing the evidence in the light most favorable to Kuo, there is no evidence to support Kuo's notion that adoption of this sequence was discriminatory.  Meshel's testimony was that he considered the remaining individuals in Stage II before the more junior trainees "because those are the people that [he] . . . had the most information on in terms of objective performance data," Meshel Dep. 157, and that within that group, Kuo "stood out" because "most on the list had met their goals, either a hundred percent of their time or the vast majority of the time," while Kuo had only met her goals 50 percent of the time.  Meshel Dep. 157–58.  But even if one discredits that explanation, it does not follow that ML's motivation was to discriminate against women.  On the record before the Court, there is no reason to think that focusing next on Stage I employees would have resulted in materially fewer terminations of women.  Indeed, after considering Stage II Trainees, ML turned to Stage I, and of the seven terminations at that Stage, three were of women.  Had Stage I been considered first, it is possible

that ML would have chosen the final two terminations from among Stage I trainees, and that one or two of those two terminations would have been of men; it is also possible, however, that ML would have turned after the seven Stage I terminations to Stage II, and terminated Kuo and Hudson.  The answer to this counterfactual is unknowable.  There is, however, no evidence at all (*e.g.*, emails, witness statements, or persuasive circumstantial inferences) to the effect that ML's motive for choosing the sequence it did had anything to do with gender.  The possibility that a different termination sequence would have generated a slightly lower number of terminations among women, or a greater number of terminations among men, is an insufficient basis on which to assume that the chosen sequence was the product of discriminatory animus.

Within Stage II, the choice of Kuo for inclusion in the RIF is amply supported by the objective data, as was the case with Hudson.  Having met her performance goals 50% of the time, Kuo was well below her Stage II LOS 6+ peers, the next weakest of whom had met his goals 83% of the time.  To be sure, ML could have chosen to terminate that peer, Bernard Tsepelman, for failing to meet his hurdles 100% of the time, but drawing the line between a trainee with a 50% success rate and one with an 83% success rate is hardly unjustifiable.  ML could reasonably conclude that a trainee with an 83% success rate, during a turbulent economic time, had a sufficient likelihood of future success to merit retention.  In any event, without more, the line that ML drew in implementing the RIF does not evidence discrimination.

### b.  Kuo's Pipeline

Kuo, like the other Plaintiffs, argues that ML should have taken into account her business pipeline; unlike the other Plaintiffs, however, Kuo points to significant business that, she argues, she had arranged before her termination for which she was not given credit.  Kuo has, in fact, vigorously disputed the accuracy of the performance data upon which Meshel and Roccanova

relied in selecting her for the RIF.  Kuo Decl. ¶ 9.  Ultimately, however, while a reasonable jury

could find that, in the hurried RIF process, Kuo was not accorded the credit she perhaps

deserved, there is no basis for finding that Kuo's gender was a factor in any such calculative

oversight.

Kuo testified to a number of prospective clients who planned to transfer business to her.

*See* Kuo Dep. 267–70.  However, the uniform evidence is that ML management did not consider

trainees' prospective business in implementing the RIF, considering instead only signed and

closed business.  Again, that approach, whatever its merits as a business judgment, cannot,

without more, fairly be termed an act of gender discrimination.

Unlike the other three Plaintiffs, however, Kuo also argues that she in fact *had* signed and

closed business within ML that was not taken into account by the RIF decision-makers.  In her

declaration, Kuo states: "The Household Opportunity Report ("HOPS report") and PMD Stage 2

Performance Summary Report defendants provided in this litigation do not accurately reflect all

of the accounts held, assets under management or production credits I held at the time of the

January 2009 reduction in force."   Kuo Decl. ¶ 9.  She then lists the alleged gaps in her HOPS

report, including clients who simply "had more money with [her]" than is reflected on the report,

clients whose transfer was not completed for procedural reasons, and a hedge fund account that

Kuo alleges she had already brought in to ML.  Kuo Decl. ¶¶ 10, 11, 13.

ML seeks to strike Kuo's statement to the effect that her HOPS report was inaccurate, on

the ground that it contradicts her deposition testimony.  Def. MTS Br. 5–6.  There, Kuo testified

that she had "no reason to dispute" the accuracy of her PMD rating from April 2008 through

January 2009, Kuo Dep. 253–254, and when asked directly whether at the time of the RIF she

had any business that was signed but had not yet posted at ML, Kuo replied that she did not.

Kuo Dep. 267.  Defendants are correct that Kuo's declaration is in direct conflict with her deposition testimony, and that Kuo's later statement that her HOPS report and PMD Report were not accurate should be stricken.  *See Palazzo*, 232 F.3d at 43 ("[I]n opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact." (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1979))).  Had Kuo not been examined at length at deposition about her performance data, or had her responses been ambiguous, her later declaration statements would be admissible; but that is not the case.  She cannot, therefore, in opposing summary judgment, offer declaration testimony that directly contradicts her deposition testimony.

Even if Kuo's declaration at the summary judgment stage could be considered, however, the result would be the same.  Kuo has not come forward with any evidence that Meshel and Roccanova *knew* that the data reflected in the reports for Kuo, on which the decision to terminate her was made, were inaccurate.  There is no evidence that, in the four-day window within which ML management determined who to lay off pursuant to RIF, the decision-makers cross-checked the accuracy of any of the employees' performance data.  The only trainee with respect to whom Meshel and Roccanova considered business not reflected on these reports was Josh Young, whose client's signed and closed 401(k) account was subject to a 90-day waiting period.  As such, it did not appear, and could not have appeared, with his performance data.  And Roccanova was aware of Young's business "because it was a former product of [hers], so [she] was interested that it came in properly," Roccanova Dep. 157; she therefore brought it to Meshel's, and then HR's, attention, Meshel Dep. 188.

Although Kuo states in her declaration that Roccanova and Meshel were aware of her unreflected business, that statement lacks any foundation in personal knowledge, and there is no

50

other evidence in the record that could support such a jury determination.  Meshel testified: "I

made the decision based on the information that I had on my screen, which is that Ms. Kuo,

clearly, in terms of the peers that I had compared her to, was the weakest performer."  Meshel

Dep. 159.  Kuo does not state that she had ever told Meshel specifically of, for example, the

hedge fund she had brought in.  And while Kuo claims she had told Roccanova about the

splitting of the account with her mentor, Vincent Ambroselli, *see* Kuo Dep. 171, 174, that in and

of itself does not suggest that Roccanova knew that Kuo's performance data as reflected on her

reports had omitted this business.  Kuo's deposition testimony was that she split the hedge fund

account with Ambroselli, and that, for reasons including that it was an institutional account, the

number of credits she received from it according to the PMD rating system was measured

differently than it might have been for another account.  Kuo testified:

> Q: You said you went to [Roccanova] about splitting this account with Vincent; is
> that correct?
> A: Yes.
> Q: Tell me about that conversation?
> A: I think it was just in the extent [*sic*] that . . . I have this hedge fund account,
> and we're—we'll be doing trades.
> Q: You wanted her to set up a split on the account, is that what you said?
> A: Yes, I think it had to have her approval.

Kuo Dep. 174.  She then explained that, because the hedge fund was an institutional account, and

because she was splitting it with Ambroselli, she received some, but not all, of the production

credits and assets she might have received had the account been another type of asset.[16]  Kuo

Dep. 175–78.  Thus, even if (1) Kuo should have received more credits for the hedge fund than

---

[16] At argument, asked to elaborate on the eccentricities involved in the bookkeeping of this
particular account, Plaintiffs' counsel stated: "The money was there.  It just wasn't in the system
in a way that she got credit for it. . . . Some types of funds were things that were making money
for Merrill Lynch but they didn't count for this program.  They had to be in a booking system,
transferred to a different type of fund in order for her to get production credits for it."  Oral Arg.
Tr. 63–64.

she did—which is not clear from the record, based on the split involved and the strictures of the PMD program, (2) Roccanova had been aware of the hedge fund Kuo points to, and (3) Roccanova should have recalled that particular business of Kuo's during the RIF weekend, Roccanova had no reason to believe that it had been inaccurately reflected in Kuo's performance data, particularly considering the intricacies and splits involved.  At most, a reasonable jury could conclude that Roccanova, Meshel, and ML inaccurately or unfairly assessed Kuo, based on incomplete data, when considering her for termination.  But although such treatment would be regrettable, it is not actionable as gender discrimination.  Kuo may have been the victim of a rushed and flawed RIF process.  She was not the victim of gender discrimination.

### c.   Other Evidence of Gender Bias at ML

Nor does the other evidence to which Kuo points raise an issue of fact as to gender discrimination.  Kuo's allegation that Mattia failed to introduce her at a series of weekly meetings, but introduced a male colleague, Hector Ramos, may be viewed as evidence that Mattia harbored a bias against women.  Again, however, Mattia played no role in the RIF in question.  And, as with the rest of the Plaintiffs, Kuo's attempt to argue that, as a woman, she was denied teaming and mentoring opportunities lacks a foundation in evidence.  Meshel appears to have acted unhelpfully towards Kuo, too, when she approached him in search of a partner to team with on international accounts, *see* Kuo Dep. 184, but she adduces no evidence that he acted differently with respect to males seeking partners, or that he facilitated teams for other employees.  *See* Kuo Dep. 229–30 ("Q: Are you aware of any teams that were created that wasn't the FA's idea or the FAs who initiated the team? A: That I don't know.").

The closest Kuo comes to providing evidence on that issue is her statement that Hector Ramos *told her* that people were talking about "who's going to be on what team."  Kuo Dep.

234.  Putting aside that this secondhand statement is inadmissible to prove the truth of the matter asserted, it does not establish a gender-discriminatory teaming system.  Kuo also argues that she was assigned a mentor later than male colleagues, but in testifying that Hector Ramos was assigned a mentor before she was, she admitted that Ramos had been hired before she was.  Kuo Dep. 154–55.  Finally, for the reasons discussed in Section IV(A)(3)(c) *supra*, the <u>Seducing the Boys Club</u> event held for the Women's Network Group is insufficient to permit an inference of discrimination in Kuo's termination.

Kuo's termination presented a closer call on the merits than the other Plaintiffs'.  In the final analysis, however, Kuo has not adduced sufficient evidence upon which a reasonable jury could find that her inclusion in the RIF was an act of gender discrimination.

## V.    NYSHRL Claims and NYCHRL Claims

Because Plaintiffs' claims of discrimination, and Vuona's claim of retaliation, under Title VII have been dismissed, the Court must decide whether to retain jurisdiction over the remaining claims, under the NYSHRL and the NYCHRL.  Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. Of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

By virtue of resolving Plaintiffs' Title VII claims, the Court has in fact resolved their NYSHRL claims.  That is because it is well-established that the substantive standards for liability under the NYSHRL and Title VII are coextensive:  "[C]laims brought under New York

State's Human Rights Law are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citation omitted). Accordingly, the Court exercises supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367, because the "values of judicial economy, convenience, fairness, and comity" favor resolving them now. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Court therefore grants summary judgment to ML on those claims. The Court similarly exercises jurisdiction over, and grants summary judgment in ML's favor with respect to, Vuona's NYSHRL retaliation claim, for the same reasons set forth in Section IV(A)(4) above. "Claims for retaliation [under NYSHRL] are analyzed under the same burden-shifting framework established for Title VII cases." *Treglia v. Town of Manlius*, 313 F.3d 713 (2d Cir. 2002). Because the Title VII and the NYSHRL claims here arise from the same set of operative facts and because the same legal standards apply to both, requiring Defendants to re-litigate these claims in state court would be neither fair nor convenient, nor would it serve the interest of judicial economy. *See Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 WL 5451189, at *17 (S.D.N.Y. Nov. 8, 2012).

The NYCHRL, however, sets out a different, more liberal standard from the Title VII and NYSHRL standard, *see Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011); *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 116 (1st Dep't 2011), not only for discrimination but also for retaliation claims. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010); *Williams*, 836 F. Supp. 2d at 174–75. For that reason, this Court declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims of discrimination and Vuona's NYCHRL claim of retaliation. Although the Court has thoroughly analyzed Plaintiffs'

54

claims according to the Title VII standard of liability, the Court has not yet invested the resources necessary to resolve the NYCHRL claims, which require application of a different standard with which the state courts are more familiar. The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery, *see Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 280–81 (S.D.N.Y. 2007) (collecting cases), and Plaintiffs would not be prejudiced by dismissal since "New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations." *Trinidad v. NYC Dep't of Corrs.*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006). The Court therefore declines to exercise jurisdiction over Plaintiffs' NYCHRL discrimination claims and over Vuona's NYCHRL retaliation claim; those claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, ML's motion for summary judgment is granted as to Vuona, Wharton, Hudson, and Kuo's claims under Title VII and the NYSHRL. The Clerk of Court is directed to enter judgment in ML's favor as to those claims, to terminate the motions pending at docket numbers 31, 33, and 52, and to close this case. Because the Court declines to exercise supplemental jurisdiction over the Plaintiffs' NYCHRL claims, they are dismissed without prejudice.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 24, 2013
New York, New York

55